SIERRA CLUB, a non-profit corporation; and Merg (Mariposans for Environmentally Responsible Growth), a non-profit corporation, Plaintiffs,

v.

Bruce BABBITT, in his official capacity as Secretary of the Interior; Department of the Interior; National Park Service; John Reynolds, in his official capacity as Western Regional Director of the National Park Service; and Stanley Albright, in his official capacity as Superintendent of Yosemite National Park; Department of Transportation; Rodney Slater, in his official capacity as Secretary of the Department of Transportation, Federal Highway Administration; Robert Stanton, in his official capacity as Director of the National Park Service; Kenneth Wykle, in his official capacity as Administrator of the Federal Highway Administration; Kiewit Pacific Company, a Delaware corporation, and Does 1 through 30, Defendants.

No. CV F 99–5219 AWI DLB.

United States District Court,
E.D. California.

July 12, 1999.

Julia A. Olson, San Francisco, CA, Sharon Eileen Duggan, Law Offices of Sharon E. Duggan, San Francisco, CA, for Sierra Club, plaintiffs.

Charles M. O'Connor, United States Attorney, Assistant United States Attorney, San Francisco, CA, E. Robert Wright, United States Attorney's Office, Fresno, CA, for Bruce Babbit, defendants.

Jewell J. Harlgeroad, McInerney and Dillon, Oakland, CA, for Kiewit Pacific Company, defendant.

## MEMORANDUM OPINION AND ORDER RE MOTIONS FOR SUMMARY JUDGMENT

ISHII, District Judge.

This action challenges the reconstruction project by the National Park Service ("NPS") regarding Highway 140 from Yosemite National Park's western border to the Pohono Bridge ("the El Portal Road" or "the Road"). Plaintiffs originally sought to enjoin Defendants from taking any steps towards the continuation of the El Portal Road reconstruction project ("the Project") until the NPS provides necessary consideration of all significant environmental effects in compliance with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 et seq. ("WSRA"), the National Park Organic Act, 16 U.S.C. § 1, et seq., and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. Plaintiffs also seek various related types of declaratory relief.

On May 6, 1999, Plaintiffs filed a motion for summary judgment. On May 25, 1999, Defendants filed an opposition and counter motion for summary judgment.

This court has jurisdiction over Plaintiff's NEPA, WSRA, and Organic Act Claims pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706. Venue is proper in this district.

In Plaintiffs' First Amended Complaint, they seek relief as set forth below:

1. A judgment declaring that the EA, FONSI, and the Biological Assessment for the El Portal Road Improvement Project are not in compliance with procedures and requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370(d) and the applicable CEQ regulations, 40 C.F.R. §§ 1500–1517.7, and are therefore null and of no legal force and effect;

2. A judgment and order enjoining the defendants preliminarily and permanently from implementing the El Portal Road Improvement Project pending the outcome of the develop-

ment and issuance of a legally adequate Environmental Assessment and Environment Impact Statement in compliance with NEPA;

3. A declaratory judgment that defendants violated the APA by failing to adopt a comprehensive management plan for the Merced River which flows through the Yosemite National Park, pursuant to the Wild and Scenic Rivers Act;

4. A declaratory judgment that defendants violated the APA by failing to develop revisions to the Yosemite National Park General Management Plan, to comply with 16 U.S.C. 1274(b), that assures that no development or use of park lands shall be undertaken that is inconsistent with the Wild and Scenic River Act designation of the Wild and Scenic River segments of the Merced River that are within the boundaries of Yosemite National Park and the El Portal Administrative Unit;

5. A declaratory judgment that defendants violated the APA by failing to protect and enhance the values of the Merced River as a designated scenic river under the Wild and Scenic Rivers Act;

6. A judgment and order enjoining the defendants primarily and permanently from implementing the El Portal River Improvement Project for violations of the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.;*

7. A judgment declaring that the actions of the defendants as set forth in this complaint are arbitrary and capricious, an abuse of discretion, not in accordance with the law, and without observance of procedures required by law, pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2);

8. A judgment declaring that the actions of the defendants as set forth in this complaint are in violation of the Organic Act and the Yosemite National Park 1980 General Management Plan;

9. A judgment ordering the Department of the Interior, NPS and their respective officials to immediately prepare, after consultation with the public, and before any other planning decisions are made which could in any way impact or alter the Wild and Scenic Merced River corridor, a comprehensive management plan in accordance with § 1274(d) of WSRA.

In response to a request from the court, Plaintiffs supplied in their Supplemental Brief filed June 25, 1999, an updated and specific explanation of the injunctive relief they seek. Plaintiffs seek the following in terms of injunctive relief: 1) an order enjoining any additional work in the Merced River corridor pending adoption of a comprehensive management plan; 2) an order requiring Defendants to amend the Yosemite Valley General Management Plan to ensure there will be no development contrary to the purposes of WSRA; 3) avoid any work on the Road in Segment D; 4) an order protecting very specifically delineated sections of vegetation and riparian habitat in Segments A, B and C; 5) an order requiring completion of the revegetation plan; 6) appointment of an impartial bat expert to evaluate the current status of bat roosts along El Portal Road, and make recommendations for mitigating impacts; 7) appointment of an oversight committee to evaluate the outstandingly remarkable values of the Merced River and assess the viability of protecting and enhancing those values in conjunction with the Project; 8) require Defendants to prepare and circulate an EIS for the El Portal Road Project before an additional work is performed.

## CHRONOLOGY

January 2, 1997 A winter storm caused Yosemite National Park and

the El Portal Road to suffer damage.

May 7, 1997 National Park Service ("NPS") issued a draft Environmental Assessment ("EA") for the Project for public review.

June 16, 1997 Public comment period ended.

August 22, 1997 Revised or Final EA issued.

August 28, 1997 NPS issued the Finding of No Significant Impact ("FONSI") for the project for a three-year construction contract.

August 28, 1997 Phase I design plans approved.

January 19, 1998 Compliance Feasibility Paper issued.

February 20, 1998 Request for Proposals issued.

August 5, 1998 NPS modified the FONSI to change the project so as to be implemented with a two-year construction schedule.

## PRELIMINARY CONSIDERATIONS

■ Plaintiffs and Defendants have moved to exclude declarations submitted by the opposing party in support of their motion for summary judgment. It is undisputed that the focal point for judicial review is the administrative record before the agency at the time of the agency's decision and "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

There are, however, exceptions to this general rule. In *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), the Ninth Circuit explained as follows:

However, certain circumstances may justify expanding review beyond the rec-

ord or permitting discovery. See, e.g., *Public Power Council v. Johnson*, 674 F.2d 791, 793 (9th Cir.1982). The district court may inquire outside the administrative record when necessary to explain the agency's action. *Id.* at 793–94. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. *[Friends of Earth v.]Hintz*, 800 F.2d[822] at 829[(9th Cir.1986)].

The district court may also inquire outside of the administrative record "when it appears the agency has relied on documents or materials not included in the record." *Id.* In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. *Id.*

In the present case, the court finds that all of the declarations at issue fall into one of the above exceptions. While the court has not relied exclusively on any declaration to reach its conclusion as to any of the issues presented, it has found the declarations helpful in understanding the factual complexities of this case. Accordingly, the objections of all parties to the declarations filed in this action are overruled.

## LEGAL STANDARD

Plaintiffs seek various forms of injunctive relief against the El Portal Road Improvement Project ("the Project"). The United States Supreme Court has explained as follows:

It goes without saying that an injunction is an equitable remedy. It "is not a

remedy which issues as of course," *Harrisonville v. W.S. Dickey Clay Mfg. Co.,* 289 U.S. 334, 337–338, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933), or "to restrain an act the injurious consequences of which are merely trifling." *Consolidated Canal Co. v. Mesa Canal Co.,* 177 U.S. 296, 302, 20 S.Ct. 628, 630, 44 L.Ed. 777 (1900). An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Cavanaugh v. Looney,* 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975); *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–507, 79 S.Ct. 948, 954–955, 3 L.Ed.2d 988 (1959); *Hecht Co. v. Bowles,* supra, at 329, 64 S.Ct., at 591.

Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims, *Hecht Co. v. Bowles,* supra, at 329, 64 S.Ct., at 592. In such cases, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles,* supra, 321 U.S., at 329, 64 S.Ct., at 592.

In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n. v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). Thus, the Court has noted that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that "where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States,* supra, 321 U.S., at 440, 64 S.Ct., at 675 (footnote omitted).

*Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The Court later summarized its holding in *Weinberger* as follows:

We reviewed the well-established principles governing the award of equitable relief in federal courts. *Id.,* at 311–313, 102 S.Ct., at 1802–1804. In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.,* at 313, 102 S.Ct., at 1803.

*Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

■ The review of final agency action is governed by the Administrative Procedure Act under an "arbitrary or capricious" standard. 5 U.S.C. § 706(2)(A). Absent a showing of arbitrary action, a court must assume that an agency has exercised its discretion appropriately. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). An agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, other otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir.1995). The Ninth Circuit has explained review of agency decisions as follows:

> Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (Marsh). We must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment. *Id.* at 378, 109 S.Ct. at 1861. We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517, 1521 (9th Cir.1995).

*Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir.1996), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996).

In specific reference to review of a decision whether to prepare an Environmental Impact Statement ("EIS"), the Ninth Circuit has stated:

We review the Corps's decision not to prepare an EIS under an "arbitrary and capricious" standard of review. *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir.1992). Using this standard, we consider only whether the Corps's decision is based on a "reasoned evaluation of the relevant factors." *Id.* at 1332. We will overturn the Corps's decision only if the Corps committed a "clear error of judgment." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 385, 109 S.Ct. 1851, 1856, 104 L.Ed.2d 377 (1989).

*California Trout v. Schaefer*, 58 F.3d 469, 473 (9th Cir.1995).

## DISCUSSION

### I. NATIONAL ENVIRONMENTAL POLICY ACT

#### A. The NEPA Process

This action is brought in part pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* and the implementing regulations which are codified as 40 CFR §§ 1500–1508. The Ninth Circuit has summarized the process under NEPA as follows:

> "The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment." *Friends of the Earth v. Hintz*, 800 F.2d 822, 836 (9th Cir.1986) (citing *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 985 (9th Cir. 1985)). To fulfill that purpose, NEPA requires all federal agencies to prepare an EIS for "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether an EIS is necessary, the agency first prepares an EA, which briefly describes the need for, alternatives to, and environmental impacts of the proposed federal action. 40 C.F.R. § 1508.9 (1994). If the environ-

mental agency determines in the EA that the federal action will not significantly affect the environment, it makes a "finding of no significant impact" (FONSI) and its NEPA review ends. *Id.* § 1508.13.

*California Trout v. Schaefer,* 58 F.3d 469, 472 (9th Cir.1995). The statute defining "environmental assessment is 40 CFR § 1508.9, which provides as follows":

"Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

"Effects" is defined in 40 CFR § 1508.8, which provides as follows:

"Effects" include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

Pursuant to 40 CFR § 1501.4, a federal agency contemplating a project must determine whether to prepare an environmental impact statement. In doing so, the agency must determine under its procedures supplementing the NEPA regulations whether the proposal is either one that normally requires an environmental impact statement or one that normally does not require either an environmental impact statement or an environmental assessment. 40 CFR § 1501.4(a). If the proposed action is not covered within either of these categories, the agency is required to provide an environmental assessment ("EA") pursuant to 40 CFR § 1508.9. 40 CFR § 1501.4(b). Based on the EA, the agency determines whether to prepare an environmental impact statement ("EIS"). 40 CFR § 1501.4. If the agency determines not to prepare an EIS it must prepare a finding of no significant impact ("FONSI") and make the finding available to the affected public as specified in § 1506.6. 40 CFR §§ 1501.4(e). A FONSI means a document briefly presenting the reasons why the action will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. 40 CFR § 1508.13.

In the present case, Plaintiffs contend that NPS violated these principles by fail-

ing to develop an EIS for the Project. Specifically, Plaintiffs contend that Defendants violated NEPA by failing to consider all pertinent direct and indirect effects of the Project in its EA and FONSI, including degradation of the Merced River Corridor and cumulative effects of the Project. Plaintiffs also contend that Defendants inadequately responded to public comments and improperly concluded that a comprehensive EIS was not required because the Project would not significantly affect the human environment.

The Ninth Circuit has summarized the court's role in review an agency's decision's in regard to NEPA requirements as follows:

A court should not substitute its judgment for that of the agency as to the environmental consequences of the agency's actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The only role for a court is to insure the agency has taken a "hard look" at environmental consequences. *Id.*

An agency's determination that a particular project does not require the preparation of an EIS is to be upheld unless unreasonable. *Foundation for North Am. Wild Sheep v. U.S. Dep't of Agriculture*, 681 F.2d 1172, 1177 (9th Cir.1982). In judging "reasonableness," "[a] court should not substitute its judgment for that of an agency if the agency's decision was 'fully informed and well-considered.'" *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985), (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).

## B. Why NEPA Requirements Were Not Met

Section 102(2)(C) of NEPA requires that all federal agencies include a de-

tailed statement of environmental consequences—known as an EIS—"in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Kleppe*, 427 U.S. at 394, 96 S.Ct. at 2723. The Council on Environmental Quality (CEQ) has promulgated regulations, see 40 C.F.R. §§ 1500–17 (1984), which bind federal agencies in implementing this requirement. Id. § 1500.3. Under the CEQ regulations an agency generally must prepare an EA to decide whether an EIS must be prepared. Id. § 1501.4(a), (b), (c); *Jones v. Gordon*, 792 F.2d 821, 827 (9th Cir.1986).

CEQ regulations outline factors that an agency must consider in determining whether an action "significantly" affects the environment within the meaning of section 102(2)(C). These factors include, inter alia, (1) the "degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4); (2) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5); (3) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by . . . breaking [the action] down into small component parts," 40 C.F.R. § 1508.27(b)(7); and (4) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," 40 C.F.R. § 1508.27(b)(10).

The standard to determine if an action will significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true,

show that the proposed project may significantly degrade some human environmental factor." *Foundation*, 681 F.2d at 1177–78 (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981)). "A determination that significant effects on the human environment will in fact occur is not essential." *Id.* at 1178. "If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Id.* (emphasis omitted).

*Sierra Club v. United States Forest Service*, 843 F.2d 1190, 1192–93 (9th Cir. 1988).

## B. *Defining the Project*

Plaintiffs contend that Defendants failed to adequately define the Project. In their motion for summary judgment, Plaintiffs claim that the "design/build" method of construction used on the Project caused an inadequate description of the Project and prevented a sufficiently detailed analysis of both environmental values and effects of the project by NPS. Plaintiffs argue that lead agencies must identify environmental effects and values in adequate detail so that they can be subject to economic and technical analysis, relying on 40 C.F.R. § 1501.2 which provides in part as follows:

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

. . . .

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

Plaintiffs also rely on 40 C.F.R. § 1502.14, which is not on point because it concerns environmental impact statements, not environmental assessments. More on point is 40 C.F.R § 1500.1(b), which provides:

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

In their motion for summary judgment, Plaintiffs specifically contend that because of the nature of the "design-build" project, NPS performed a substantial amount of analysis nearly six months after the FONSI was issued. Plaintiffs claim that the post-decision Compliance Feasibility Paper and attached Cost Consideration Compliance Table for El Portal Road Improvements, Working Draft, January 19, 1998 (4 AR 01128–1141) demonstrates that NPS considered such items as not removing Cascade Dam, eliminating mitigation measures to cultural and historic resources, increasing cut walls, moving staging areas to sensitive species locations, expanding the road footprint and eliminating sewer repair requirements. Plaintiffs argue that NEPA and CEQ regulations specifically require this type of analysis to be performed prior to the decision on a project. Plaintiffs argue that it was only at the later date that NPS actually defined the Project parameters, thereby skewing the impact analysis. Plaintiffs also rely on the declarations of Kattlemann and Sanders to argue that the description of the Project as "design/build" is inadequate and prevents a sufficiently detailed analysis of environmental values and effects of the project.

Defendants dispute Plaintiffs' contention that the Compliance Feasibility Paper, dated January 19, 1998, demonstrates that the parameters were not defined until six months after the FONSI was issued. Defendants explain that the Compliance Feasibility Paper came about because the initial proposals from potential contractors in response to the "request for proposals" contained costs far beyond the available funding for the Project. The purpose of the Compliance Feasibility Paper was to explore possible ways to meet the Project objectives with available funds and within the parameters of the decisions made in the EA and FONSI. The cost cutting suggestions primarily addressed construction schedules, staging areas, and use of simulated stone in cut slope walls and drainage systems. Expansion of the allowable footprint of the roadway was specifically rejected because it was recognized that it would be a change beyond the scope of the FONSI. Defendants argue that these same issue would have been faced if the Project had used competitive sealed bidding (instead of design/build construction) and the bids had come in too high.

In response to Defendants' arguments regarding the Compliance Feasibility Paper, Plaintiffs argue that there were numerous proposed changes set forth, with no commitment either way that they would or would not be implemented. Some of these appear significant, such as "eliminate all but the most basic temporary revegetation requirements," 4 AR 01133, "eliminate dam removal," 4 AR 01134, and changes in the staging areas. Plaintiffs argue that there is now no guarantee as to what the contractor and defendants will now accept or reject as elements of the Project, considered beyond the analysis and public NEPA process of the EA and FONSI.

In general response to Plaintiffs' contention that the design/build construction of this project has led to an inadequate description of the Project, Defendants first contend that both the draft and revised EA explicitly stated that "design/build" construction would be used for the Project. Defendants argue that if Plaintiffs objected to the use of the design/build method, any necessary litigation should have been initiated at that time, prior to the award of the design/build contract.

In further response to Plaintiffs' contentions, Defendants argue at length that the Project was adequately described. Defendants argue that a 93 page preliminary design existed in the form of Phase I design plans, which were incorporated by reference into the Revised Environmental Assessment. Defendants assert that these engineering drawings defined the scope and limits of the Project in detail on a station by station basis. Defendants state that these details included a preliminary alignment which defined the new Road alignment for impact purposes and the envelope where the contractor would be allowed to work. The plans further identify specific features and elements along the roadway which must be saved or avoided. Defendants claim that the Phase I design plans (70 AR) contained a preliminary alignment that showed the footprint of the Project and enabled NPS to calculate for the EA and FONSI the size of the area that would be impacted.

Finally, Defendants argue that mitigation measures were incorporated into the Project to minimize identified environmental impacts below the level of significance. The mitigation measures are specific and are included in the EA. Specifically, as to the use of design/build, the Park Service imposed additional conditions including a staff of resource specialists (landscape architect, biologist, revegetation specialist, and archeologist) to conduct inspections and "to ensure that the reconstruction activities do not exceed the scope of the EA." The mitigation measures are binding, and the contracting officer has authority to stop work of the contractor fails to carry

out his written orders or perform contractual provisions.

In their Reply, Plaintiffs reiterate at length their claim that the design/build nature of the Project did not provide an adequate project description. In response to Defendants' claim that the Phase I design plans were incorporated by reference into the Revised or Final EA, Plaintiffs correctly argue that both the Phase I design plans and the Request for Proposal ("RFP") were developed after the close of public comment, so that the public did not have an opportunity to review and comment upon them. Plaintiffs also correctly point out that the Final EA, into which Defendants incorporated by reference the Phase I design plans, was not subject to public comment. The Phase I plans were not approved until August 28, six days after the Revised EA was issued, and the same day as issuance of the FONSI and approval of the project. 4 AR 01110, 70 AR 07307. Similarly, Plaintiffs assert that the Biological Assessment was published only a few days prior to the publication of the EA. 2 AR 00542.

In addition to arguing that the public did not have an opportunity to review the document relied upon by Defendants to demonstrate that they adequately defined the Project, Plaintiffs argue that NPS did not have adequate description of the Project before it reached its final finding of no significant impact. Plaintiffs argue that only the documents the agency had before it at the time it issued the FONSI can be relied upon to support Defendants' position. Specifically, Plaintiffs claim that Defendants could not have considered the Phase I design plans or the Biological Assessment, because they were published only a few days before the publication of the Revised EA.

In response to Plaintiff's arguments regarding the incorporation of the Phase I design plans in the Revised EA, Defendants contend that the plans existed and were considered before they were approved by the Regional Director for the NPS on August 28, 1997. Defendants argue that the Draft Phase 1 Design Plans were developed over a period of time using numerous field reviews and utilizing many different discipline and resource specialists and were signed by the Division Engineer of the Federal Highway Administration on August 20, 1997, and by the NPS Denver Service Center and the Superintendent for Yosemite National Park on August 21, 1997. Defendants argue that portions of the draft Phase I Design Plans appear throughout the project record.

Relatedly, Plaintiffs argue that the NPS acted wrongly in incorporating the Phase I design plans into the Revised EA. Plaintiffs rely on an Eastern District case in which Judge Karlton held as follows:

> I begin by noting that there is no apparent reason to believe that an incorporation process is appropriate relative to an EA. Thus although the CEQ regulations permit, under stringent standards discussed below, incorporation by reference in an EIS, 40 C.F.R. § 1502.21, no such provision is made for an EA. On the contrary, the regulations appear to contemplate that an EA will be a concise public document which briefly presents sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. 40 C.F.R. § 1508.9. Given the purpose of an EA, such restriction on the document does not appear unreasonable. As I explained above, the threshold for requiring an EIS is quite low. Thus only in those obvious circumstances where no effect on the environment is possible, will an EA be sufficient for the environmental review required under NEPA. Under such circumstances, the conclusion reached must be close to self-evident and would not require an extended document incorporating other studies. Moreover, because

the purpose of an EA is to decide whether an EIS must be prepared, 40 C.F.R. § 1501.4(a), (b), (c); *Jones v. Gordon,* 792 F.2d 821, 827 (9th Cir.1986), the document itself (and any attachments or appendices included with it) must facilitate or enable public comment concerning the agency's determination that the project does not significantly affect the environment. Cf. *Sierra Club v. U.S. Forest Service,* 843 F.2d 1190, 1193 (9th Cir.1988).

Moreover, even if an EA need not stand on its own, the standards applicable to the incorporation of material into a document created in response to the regulations implementing NEPA are relatively rigid. Application of those standards to the instant EA demonstrates that neither the 1981 DEIS nor the 1983 EA were properly made a part of the determination at bar.

As I have previously explained, under certain circumstances the law permits incorporation of materials by reference into an EIS. [FN13] The propriety of such incorporation is dependent upon meeting three standards: 1) the material is reasonably available; 2) the statement is understandable without undue cross reference; and 3) the incorporation by reference meets a general standard of reasonableness. See California v. Bergland, 483 F.Supp. at 485 (incorporation of material into a DEIS), aff'd. in relevant part, California v. Block, 690 F.2d at 765. Application of the three criteria noted above suggests that the court must find that the 1981 DEIS and the 1983 EA were not incorporated into the 1987 EA.

*Natural Resources Defense Council v. Duvall,* 777 F.Supp. 1533, 1538–39 (E.D.Cal. 1991). In footnote 14, Judge Karlton held that the government has the burden of persuasion on this issue. Applying the holding to the present case, Plaintiffs argue that the Phase I design plans were not

available until the day of approval or after approval, the EA was not understandable without cross reference, and Defendants were not reasonable in withholding in such information from the public review process. In response, Defendants argue, as stated above, that the Phase I Design Plans existed and were considered before the issuance of the EA.

Finally, Plaintiffs further argue that the Phase I design plans and the RFP do not provide a legally adequate project description. Plaintiffs argue that the Phase I plans identify specific features to be saved, yet none identify the extent of removal, blasting and damage to be done.

In their Supplemental Brief, Defendants contend that NPS presented the scope of the Project to the public through several means, including the draft EA, the Revised EA, open houses, planning updates, and videos.

▮▮▮ The court finds, as Plaintiffs argue, that because the Revised EA was issued on August 22, 1997, after the close of the public comment period and the scientific review of the project impacts, it cannot be relied upon as meaningfully providing the detailed definition of the Project required under § 1501.2. The court further finds that Defendants have pointed to nothing in the draft EA showing that document met the requirements of § 1501.2. The draft EA speaks in generalities and contains few details of what would actually be done on the Project, thus making it impossible to relate project elements to project impacts. Lacking is sufficient detail to understand the nature, extent and location of rock removal, tree removal, vegetation removal, rebuilding of guardwalls (particularly the height), and construction of fills into the Merced River or riparian corridor. Further, there is no mention of uniformly raising the road bed by three feet, which Defendants contend in response to Plaintiffs'. challenge to the increased height of the guardwalls.

██ In regard to the open houses and planning updates, Plaintiffs argue that NEPA requires an adequate project description and evaluation of alternatives in an EA or EIS, and that information presented in another form does not meet this requirement unless it is fully incorporated into the EA or EIS. Plaintiffs cite *Natural Resources Defense Council v. Duvall*, 777 F.Supp. 1533 (E.D.Cal.1991), in which Judge Karlton discusses the propriety of incorporating by reference other documents into an EA. In so doing, Judge Karlton states, "Moreover, because the purpose of an EA is to decide whether an EIS must be prepared, ... the document itself (any attachments or appendices included with it) must facilitate or enable public comment concerning the agency's determination that the project does not significantly affect the environment." *Id.* at 1538–39. The court finds this reasoning to be persuasive, and therefore rejects Defendants' argument that the open houses or project updates may be considered in tandem with the EA in determining whether the EA provided the public with an adequate description of the Project.

██ Plaintiffs also persuasively argue that the videos referred to by Defendants do not constitute a Project description as required under NEPA. The January 1997 video was produced before the Project came into existence and the October 1998 video was produced after the Project was approved. Neither of these videos satisfy the requirement of an adequate project description under NEPA.

In summary, Plaintiffs contend that Defendants failed to comply with the requirement in 40 C.F.R. § 1501.2(b) that each agency shall "Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses." Plaintiffs claim both that insufficient detail was provided to allow the public a meaningful opportunity to comment on the Project during the planning stages and also that insufficient detail existed for Defendants' own experts to express an informed opinion and for Defendants to make an informed decision.

Based on the foregoing, the court concludes that Plaintiffs' contentions are meritorious and that Defendants violated NEPA by failing to comply with the requirement under 40 C.F.R. § 1501.2(b) that each agency shall "Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses." The court finds that Defendants acted arbitrarily and capriciously in failing to provide an adequate description of the Project. The court will grant Plaintiffs summary adjudication on this issue and will issue a corresponding declaratory judgment. The issue of injunctive relief will be discussed below.

## C. Identification and Evaluation of Significant Adverse Impacts

██ NEPA requires federal agencies to prepare an EIS for "major federal actions 1536 significantly affecting the quality of the human environment." 42 U.S.C. S4332(2)(C). Plaintiffs contend that Defendants failed to adequately identify and evaluate significant adverse impacts and so acted arbitrarily or capriciously in not preparing an EIS. "[T]o prevail on a claim that [a federal agency] violated its statutory duty to prepare an EIS, a 'plaintiff need not show that significant effects will in fact occur.'" [*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998)]. It is enough for the plaintiff to raise substantial questions whether a project may have a 'significant effect' on the environment. *Id.*

### 1. Controversy

Initially, Plaintiffs rely on 40 C.F.R. § 1508.27, which provides that "significantly" as used in NEPA requires consider-

ations of both context and intensity. 40 C.F.R. § 1508.27(b) provides as follows:

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

In arguing that Defendants failed to adequately identify and evaluate significant adverse impacts, Plaintiffs rely on subsection (4) above to argue that Defendants failed to correctly evaluate the intensity of the impacts. Specifically, Plaintiffs contend that the Administrative Record is replete with examples of controversy over the environmental effects of the Project. Specifically, Plaintiffs contend that the EA, BA, FONSI and Response to Comments are in direct conflict with and ignore the advice of long-time Park employees and experts. Plaintiffs cite a letter by Yosemite National Park biologist Steve Thompson of April 27, 1997, and a letter of Yosemite National Park historian Jim Snyder, dated April 10, 1997. In these letters, the writers express their disagreement with the NPS decision to implement the Project.

In response, Defendants cite *Northwest Environmental Defense Ctr. v. BPA,* 117 F.3d 1520, 1536 (9th Cir.1997), in which the Ninth Circuit explained that,

"A federal action is controversial if 'a substantial dispute exists as to [its] size, nature, or effect.' *LaFlamme,* 852 F.2d at 400–01 (internal quotations and citations omitted). Controversy does not refer to the existence of opposition to a use." *Id.* at 401.

Defendants argue that in their letters, neither Mr. Thompson nor Mr. Snyder were

offering expert views. Rather, Defendants argue, they were disagreeing with the policy decision to reconstruct the Road. Defendants argue that policy disagreements of this nature do not rise to the level of "controversy" within the meaning of § 1508.27(b)(4).

In their Reply, Plaintiffs argue that the Record establishes that Thompson and Snyder are specialists, and argue that when an EA is at issue, the disagreement among experts is an important factor as to whether substantial questions have been raised about environmental impacts and the need for an EIS. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.1998). In summary, Plaintiffs claim that "the significant disagreement among experts on the viability of the project," and the post hoc mitigation measures that were adopted, proves that there was a "substantial question" raised as to the environmental impact of the Project and that an EIS was needed.

■ The court finds that Plaintiffs' contention has merit. Contrary to Defendants' contention, the letters of Thompson and Snyder both address concerns regarding specific impacts of the Project, and are not limited to opposition to the Project as a whole. The court concludes that its finding supports the larger conclusion that Plaintiffs have raised substantial questions as to whether the Project may have significant effects on the human environment.

### 2. Biological Resources

In further support of their claim that Defendants failed to adequately identify and evaluate significant adverse impacts of the Project, Plaintiffs present several contentions that NPS failed to adequately address significant adverse effects on biological resources.

#### a. biological surveys

Plaintiffs contend that inadequate biological surveys were done. Plaintiffs point out that on March 21, 1997, in response to the emergency repairs and safety improvements being made on the Road after the flood, the NPS wrote that the planned safety improvements to the Road would have a "severe and direct impact" on biological resources within the zone of blasting and slope restoration, and indirect impacts to those resources over a larger area. 2 AR 00182. The report also stated that, "[e]xcept for Thompkin's sedge, for which the impact can be accurately quantified, not enough is known about other sensitive species to ascertain potential impacts with any degree of certainty. This applies to possible bat roosts, as well as to sensitive invertebrates and plants for which appropriate habitat may be present." *Id.*

Plaintiffs claim that six weeks later, however, before doing any other species surveys, on May 7, 1997, the NPS issued the Draft EA and declared that, "[a]pplication of mitigation measures during and after the construction period would assure that construction-related impacts on sensitive species would be minimized as much as practicable and would not be significant." (2 AR 00477). The Draft EA also states that there is no data "that suggests that the proposed action would impact sensitive wildlife species in the area." *Id.* Plaintiffs allege that although the draft EA states that a Biological Assessment would address the sensitive species designated by U.S. Fish and Wildlife, the Biological Assessment was completed before any surveys were done on any of the sensitive species in the project other than federally listed Thompkin's Sedge. Plaintiffs further allege that if any other surveys were performed, they are not included in the record and were therefore not relied on by the agency in preparing the EA or in issuing the FONSI. Furthermore, Plaintiffs contend that the FONSI mitigation measures requiring species surveys be conducted before road construction is fur-

ther evidence that no surveys for species were performed prior to assessing environmental consequences in the Final EA and prior to issuing the FONSI.

In response to Plaintiffs' contentions that inadequate biological surveys were done, Defendants contend that Plaintiffs ignore statements in the revised EA and FONSI establishing that further studies were done and sensitive species were either absent from the project vicinity or would suffer insignificant impacts from construction, citing 2 AR 00617 and 4 AR 00971. The first citation given by Defendants, 2 AR 00617, comprises page 81 of the EA. Contained on that page is the following language:

> No data exist that suggest that the proposed action would impact sensitive wildlife species in the area. Following recommendations in the draft EA, a biological assessment (BA) has been prepared throughout the construction area to address the sensitive species listed in Table 4.1. Results from this BA determined whether or not sensitive species exist in the immediate area and developed mitigation measures to ensure that construction activities will not significantly impact any sensitive species that may occur in the area.

> The field surveys and analysis completed during the BA found that sensitive species identified in the draft EA as possibly being present in the project area are absent from the project vicinity or would suffer insignificant impacts to their population from construction. This includes federally listed threatened and endangered species. The USFWS has reviewed the BA and concurs with the findings. (Appendix A).

The second citation given by Defendants, 4 AR 00971, comprises page 12 of the "Response to Comments for El Portal Improvements," issued in August of 1997. That page provides in part as follows:

A few comments were received expressing concern for wildlife and sensitive species. As previously mentioned, habitat areas along the El Portal Road and the Wild and Scenic Merced River will either be preserved or restored as a part of the proposed project. A NPS staff of natural resource specialists (including a landscape architect, a biologist, and a revegetation specialist) will make inspections to review the extent of impacts to the environment and make sure the reconstruction activities do not escalate beyond the scope of the environmental assessment. This staff will also direct the contractor where to place snow fence to delineate construction limits and review construction plans submitted during the design/build process.

Additional Biological Field Studies. Following recommendations in the draft EA, substantial additional biological field studies and analysis have been conducted. The surveys found that sensitive species identified in the draft EA as possibly present in the project area are absent from the project vicinity or would suffer insignificant impacts to their populations from construction. These field studies and analyses have focused on identifying presence of sensitive species in the corridor area and evaluating the potential for impact on them. The studies were conducted in May and June, 1997. The studies were conducted by experienced biologists with expertise in bats and other sensitive mammals; insects; invertebrates; birds, including raptors, owls, and songbirds; amphibians; and reptiles. Surveys for sensitive plant species were conducted by Yosemite National Park staff in April 1997. The NPS determined that proposed action will not adversely affect any listed species or their habitats. The U.S. Fish and Wildlife Service (USFWS) concurred with the finding.

Defendants argue that the studies referred to in these two statements were conducted

in April through June 1997, before the FONSI, and were approved by the U.S. Fish and Wildlife Service. *See Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 987 (9th Cir.1985) (where virtual agreement existed among local, state, and federal government officials, private parties, and local environmentalists on a project and on the content of the EIR/EA, the extensive coordination and agreement between the state and federal government was a factor supporting the agency's decision not to prepare an Environmental Impact Statement).

In response to Defendants' claims that surveys were conducted in April through June of 1997, Plaintiffs contend in their Reply that if such studies were done, they are not in the administrative record. Plaintiffs argue that the court cannot assume such surveys exist unless they are produced. In response to the statement in the Draft EA that there is no data "that suggests that the proposed action would impact sensitive wildlife species in the area," Plaintiffs argue that Defendants failed to do the necessary research to reach this conclusion.

Defendants also argue that the EA and FONSI imposed a mitigation measure that prior to any construction, there would be additional surveys for "sensitive plants, bat roosts, nesting birds, and snails to at least 20 feet outside the construction zones." 4 AR 01111. Conservation measures are required if any sensitive species are located. *Id.* In addition, the Park Service Staff of natural resources specialists were required to conduct inspections to make sure the reconstruction activities did not escalate beyond the scope of the EA. *Id.*

In their Supplemental Brief, Defendants cite *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir.1985), for the principle that NEPA does not require the forefront of scientific methodology. However, in *Friends of Endangered Species*, the Ninth Circuit held as follows:

NEPA does not require that we decide whether an EIR is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology. See *Hart and Miller Islands Area Environmental Group, Inc. v. Corps of Engineers of the U.S. Army*, 505 F.Supp. 732, 755 (D.Md. 1980); *Cabinet Mountains Wilderness v. Peterson*, 510 F.Supp. 1186, 1190–91 (D.D.C.), affirmed 685 F.2d 678 (D.C.Cir.1982). *Our task is simply to ensure that the procedure followed by the Service resulted in a reasoned analysis of the evidence before it, and that the Service made the evidence available to all concerned. Save Lake Washington v. Frank*, 641 F.2d 1330, 1337 (9th Cir.1981); *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The Service, in the present case, sought out and considered extensive comments on the Biological Study during the public comment period and afterward, and incorporated these comments into its Permit Findings and final Plan. Because the Service was unaware of appellant's specific field study criticisms before making its decision, we certainly cannot fault the Service for failing to address these criticisms.

*Id.* at 986 (emphasis added). Whether the procedure followed by the NPS "resulted in a reasoned analysis of the evidence before it" and whether the NPS made the evidence available to all concerned is exactly what is now at issue.

In their Supplemental Brief, Defendants present the declaration of Thomas Wilkinson Mulroy regarding the research and field surveys conducted in connection with the NEPA analysis for the Project. Defendants assert that "[a]ll available field notes and survey reports prepared in relation to the BA have been attached to the Declaration of Dr. Thomas Mulroy." Sup-

plemental Brief, 24:28—25:1. Defendants rely upon this declaration to establish that the conclusions of the Biological Assessment were based on extensive research and field surveys. However, Defendants state that the field notes and survey reports "were not included in the Administrative Record for this case because, as explained by Dr. Mulroy, the contract between Science Applications International Corporation (SAIC) and the National Park Service did not require that SAIC provide intermediate survey reports or field notes to the NPS. As explained by Dr. Mulroy, the BA followed immediately from completion of the filed [sic] studies, obviating the need for an intermediate product."

■ As Plaintiffs point out, through this statement, Defendants have admitted both that the "hard data" supporting the BA was not available to the public for review and that it was never reviewed by NPS. The court finds, therefore, that in regard to the evaluation of biological resources, Defendants have failed to comply with the requirement of 40 C.F.R. § 1500.1(b) that, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." The court concludes that this finding supports Plaintiffs' main contention that Defendants failed to ·identify and evaluate significant adverse impacts.

*c. revegetation plan*

Plaintiffs contend that the Biological Assessment makes an unfounded proposition which was used to support NPS's decision to issue a FONSI. Specifically, it states that, "[t]he unique characteristics, special features, and habitat areas along El Portal Road and the wild and scenic Merced River will either be preserved or replaced as part of the proposed project." 5 AR 01199. Plaintiffs argue that neither the EA nor the FONSI explain how the NPS

will replace 100 year-old trees that have been or are being cut down. Plaintiffs assert that even if the NPS wanted to replace cut trees, they have no information on the number, size or species of trees being removed during the project construction. Plaintiffs further contend that the Tompkin's sedge salvage operation was done long before the revegetation plan was issued on May 20, 1999. Plaintiffs claim that approximately 90% of the sedge dies after being transplanted, which Plaintiffs argue is a significant impact.

In response, Defendants argue that the Revised EA explained that ·except for the roadway itself, the area affected would be revegetated. 2 AR 00615. The Revised EA also pointed out that vegetation in the area is resilient because of the naturally high occurrence of floods, fires ·and rockslides. *Id.* Defendants argue that it cannot be seriously contended that the Park Service committed a clear error in judgment in concluding these impacts would not be significant.

Plaintiffs argue ·in their Reply that the site specific revegetation plans were not part of the EA, BA or FONSI, and were not created May 20, 1999. Plaintiffs complain that the plan is incomplete because it still does not "establish clear-cut success criteria," spell out the details of a long-term monitoring plan, discuss remedial action to adopt if the success criteria are met, provide specifics on the number of plants of each species to be established, or provide maps showing where these plants will be located.

Plaintiffs quote Park biologist Thompson, who advised that, "the use of 'concrete-reinforced' rock fill leaves little chance for re-establishment of riparian vegetation." 6 AR 01656. In response, Defendants argue that the Park Service required mitigation measures including irregular ledges, shelves, planting pockets, benches, and irregularities designed into

cuts and slopes for vegetation and revegetation. 2 AR 00971, 01113–1114.

In their Supplemental Reply Brief, Defendants argue that mitigation measures in the form of the revegetation programs are mandated by contract but can only be implemented upon completion of the Project. This is because the revegetation programs cannot proceed on unstable slopes or with uncontrolled drainage. Further, Defendants provide a declaration by the Natural Resources Project Manager for the Flood Recovery Office at Yosemite National Park, stating that the scientific panels and audit reports are "unnecessary and will not increase the effectiveness of the revegetation efforts on the Project." Defendants rely on the Declaration of Susan Fritzke, stating that the revegetation plan for the Project is being developed and will be implemented by Bitterroot Restoration under contract with NPS.

Defendants dispute Plaintiffs' assertion that an inventory needs to be taken of vegetation which has been removed, arguing that the process of ecological restoration is not meant to replace one tree for each tree removed. Defendants also dispute Plaintiffs' claim that there has been an irretrievable loss of genetic diversity in regard to Thompson's sedge. Defendants assert that plants and seeds were salvaged from the Project area, and will be replanted into appropriate zones.

The court concludes that in essence, Plaintiffs contend that the revegetation plans provides by Defendants are not sufficiently specific, while Defendants argue that because of the nature of the Project as a design/build project, they are unable to provide site-specific revegetation plans until the Project is completed. After reviewing all of the parties' arguments, the court concludes that Defendants' reliance upon a revegetation plan that was not yet developed in issuing the EA adds weight to Plaintiffs' argument that substantial questions exist as to whether the Project will have a significant effect on the environment.

### d. bat species

Plaintiffs contend that Defendants have failed to consider the impact of the Project on the several species of bats that live within the Project area. Specifically, Plaintiffs claim that in the EA, no mitigation measure was developed to accommodate the needs of bats sensitive to noise during spring nesting. Defendants argue that the EA contains a mitigation measure mandating that "Blasting will not occur between May 1 and September 30 to avoid impact during the reproductive season of bats." 2 AR 00632. In their Reply, Plaintiffs argue that this mitigation measure did not address the concern of NPS experts that there be protection for nesting bats, so that blasting should occur only in October and November. Plaintiffs also complain that NPS has recommended that to avoid likely roosting and foraging habitat "if possible," which they claim leaves the habitat open to destruction.

Plaintiffs discuss at length the report by Defendants' own bat expert, Dr. Elizabeth Pierson. The court agrees with Plaintiffs that Dr. Pierson's report as a whole expresses the opinion that the impacts of the Project to the rare bats in the Merced River Canyon and Yosemite would be significant. While Dr. Pierson recommends mitigation measures, nothing in her report suggests that these measures, even if fully implemented, would change the fact that the impact of the Project on the bats will be significant. Declaration of Thomas W. Mulroy, "Bat Surveys for El Portal Road Project." Defendants do not meaningfully reply to this fact. The court must conclude, therefore, that Plaintiffs have raised substantial questions as to whether the Project will have a substantial effect on the environment in the form of the local bat population.

### e. trout

Plaintiffs contend that Defendants have inadequately assessed the impact of the Project on rainbow trout in the Project area. Plaintiffs claim that in 1982, NPS identified the presence of indigenous rainbow trout in the project area, and then again in 1997 said that rainbow trout were present. 8 AR 2159, 2 AR 00176. Plaintiffs claim that "without any surveys or data to support the determination, NPS stated in the Final EA that Rainbow Trout have disappeared from the project area. 2 AR 00448." Plaintiffs' Points and Authorities, 28: 22–24.

In response, Defendants assert that in the Final EA, NPS asserts that the native rainbow trout, once present, disappeared due to competition with non-native fish. 2 AR00584. Defendants first argue that Plaintiffs have produced no evidence that NPS is wrong. Second, Defendants argue that whether there are Rainbow Trout in the area makes no difference to the Project, because there are golden trout, cutthroat trout, brown trout, and the Arctic grayling still present. Thus, Defendants argue, whether rainbow trout are also still present is not a factual dispute material to issues connected with the reconstruction of the Road.

The court finds that Defendants' arguments entirely miss the point. While the Record establishes that rainbow trout may be present, Defendants have pointed to nothing indicating that NPS evaluated the current presence of rainbow trout in the River in a way that could be reviewed by either the public or Defendants themselves, or that NPS evaluated the potential for impact on that species by the Project. As Plaintiffs argue, the presence or absence of the species is entirely relevant to what measures are taken to ensure no significant impact upon the riparian corridor of the Merced River. The court must conclude, therefore, that Plaintiffs' arguments regarding rainbow trout add weight to Plaintiffs' contention that substantial questions exist as to whether the Project will have a significant effect on the environment.

In summary, in light of the forgoing discussion, the court finds that Plaintiffs have demonstrated the existence of substantial questions as to whether the Project may have a substantial effect upon the human environment in regard to biological resources. These substantial questions rest on issues involving biological surveys, the revegetation plan, bat species, and trout.

### 3. Enroachment into river and riparian habitat

Plaintiffs contends that the EA never describes how many acres of water, riparian habitat or river channel will be disturbed by the Project and that this precluded the NPS from fully evaluating the environmental consequences of the project. Plaintiffs further note that NPS stated that in some cases, riverbed enroachment "will cause backwater, dropping sediments, and redirecting river flows back to the main channel." 8 AR 02069. Plaintiffs claim that these impacts are not addressed in the EA or FONSI. Finally, Plaintiffs argue that the requirement that "the contractor would avoid enroachments on the river ... where possible," 5 AR 01200, is not a mitigation measure, but is merely a suggestion that leaves the contractor with the option to enroach on the river where it deems necessary without any penalty.

In response, Defendants contend that the EA explained that the preexisting road fill already encroaches on the River. 2 AR 00611. The EA further disclosed there would be some further enroachment, but that it would be limited. Id. The EA also pointed out that the road improvements would improve current conditions by increasing drainage and reducing erosion

and sedimentation. 2 AR 00611–13. Finally, Defendants argue that mitigation was imposed requiring the contractor to avoid enroachment on the river when possible, and slope rations were required that would minimize impacted areas. 4 AR 01114.

The court finds merit in Plaintiffs' arguments that the lack of specificity regarding the enroachment on the river and riparian habitat precluded NPS from fully evaluating the environmental consequences of the Project. The court concludes that this finding adds weight to Plaintiffs' contention that substantial questions exist as to whether the Project will have a significant effect on the environment.

*4. Cascade Dam*

Finally, Plaintiffs contend that NPS failed to take the requisite "hard look" at the impacts associated with the removal of the Cascade Dam. Plaintiffs state that the NPS planned to remove the Cascade Dam as early as 1982, 8 AR 2146, but at that time, there was concern that the removal of the dam conflicted with the General Management Plan. 8 AR 2170. Plaintiffs state that the NPS reapproached the issue in 1987, again filed an EA for the removal of Cascade Dam. 8 AR 2182. The EA stated that, "[t]he removal of the dam structures below the streambed level was rejected as being excessive because the potential effects on the environmental and the lateral support of the roadway could be adversely affected." 8 AF 2200. A subsequent 1989 report discussed several series impacts of removal of the dam. 8 AR 2240.

Plaintiffs claim that despite the previously documented significant impacts associated with the dam removal, the NPS decided in May 1997 that it "will not address removal in our 140 EA other than reference the appropriate planning documents." 8 AR 2092. Plaintiffs also claim

that it was not until August 12, 1997, that "the NPS staff began developing the preferred alternative for the dam removal and road realignment at the intersection of Highway 140/120, long after the public comment period on the draft EA had ended and only days before the FONSI was issued." Plaintiffs' Points and Authorities, 30:17–19. Additionally, Plaintiffs claim that the results of sampling the bottom sediments from the impounded water behind the dam was issued on September 3, 1997, after the approval of the Project. 8 AR 2128.

In response to Plaintiffs' claims about Defendants' analysis of the removal of Cascade Dam, Defendants assert that the removal of the dam was disclosed in the Revised EA, which explained that the removal of the dam will "restore natural channel grades and processes along that segment of the river." 2 AR 00563, 00612. Further, the Revised EA explained that the removal of the dam was "addressed in a separate environmental document (NPS 1987, 1995)."

Defendants argue that the purpose of the removal of Cascade Dam is to restore the natural condition of the river, and that Plaintiffs presumably do not object to that. Finally, Defendants argue generally that any challenge to the removal of the dam should have been brought long ago, and addressed to the environmental documents the Park Service prepared on that proposed action.

In their Reply, Plaintiffs argue that there is no evidence in the record shows that the removal of the dam will restore the natural condition of the river. Plaintiffs further argue that the removal of the dam in this project is unique, because it also includes a realignment and widening of the intersections at Highways 140 and 120.

In their Supplemental Brief, Defendants argue that removal of Cascade Dam was

included in .the Draft EA, describe the supporting preexisting documents which were incorporated, describe the efforts taken to comply with water quality standards, and again emphasize the intent to restore natural conditions. However, none of this directly addresses Plaintiffs' contention regarding the lack of analysis of significant impacts on the environment caused by removal of the dam.

The court concludes that Plaintiffs have demonstrated that substantial questions exist as to whether the removal of Cascade Dam will have a significant effect on the environment.

### 5. Historical and Cultural Resources/Scenic

Under this heading, Plaintiffs contend that NPS failed to adequately evaluate impacts associated with increased traffic on the reconstructed road and any associated safety issues. Plaintiffs claim that the NPS did not analyze impacts from realignment of the road on speed of travel or on safety, nor did it assess the need for a wider road to improve safety after the spring 1997 safety improvements were completed.

In response to Plaintiffs' contention that the 1997 safety improvements solved the problems with the Road, Defendants point to the language in the EA explaining the 1997 emergency repairs fixed six portions, but that "accident have occurred along the entire length of the roadway" and that the remaining portions consist of "substandard geometric conditions and insufficient lateral clearance." 2 AR 00621. Further, the emergency repairs were only temporary. 2 AR 00297.

Defendants argue that how the road improvements will encourage more, as opposed to provide safer, travel is unclear. Defendants argue that after completion of the improvements, El Portal will remain a narrow, winding, two-lane mountain road with a speed limit of 35 miles per hour. Defendants contend that it acted within its discretion in modernizing the road so that buses can stay on the right side of the center line, and improving drainage to prevent washouts and erosion.

██ The court concludes that Plaintiffs have not demonstrated that substantial questions exist as to whether safety issues will have a significant effect on the environment. Therefore, Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in regard to properly considering safety issues associated with the Project.

### D. Cumulative Significant Adverse Impacts

Plaintiffs contend that Defendants violated NEPA by failing to evaluate the cumulative significant adverse impacts of the Project. Plaintiffs' specific claim is somewhat vague, but Plaintiffs seem to claim that Defendants failed to consider the cumulative impacts as to bats, riparian habitat, and the rare river ecosystem. Plaintiffs further claim that the NPS failed to disclose future projects to arise out of the Project. Specifically, Plaintiffs claim that the NPS intended to use the staging areas for future development, but did not disclose this in the EA and did not evaluate the cumulative affects associated with these future activities. Plaintiffs rely on 40 CFR § 1508.25(a), which provides in part:

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (SS1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) *Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.*

"Cumulative impact" is defined in 40 CFR § 1508.7 as follows:

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

In response to Plaintiffs' contention, Defendants contend that both the draft and revised EA include lengthy descriptions of cumulative impacts, which fully discuss the issues addressed by Plaintiffs. 2 AR 00496–503, 2 AR 00640–48. The revised EA discusses the overall impact of the Project on sensitive species, including bats, and states that the Project would not create significant cumulative impacts on such species because the Project, along with its mitigation measures, has been designed to have only minimal impacts on bats and other sensitive species. 2 AR 00490–92, 2 AR 00632. Defendants further contend that they evaluated cumulative impacts for the Merced Canyon ecosystem and its riparian areas, and concluded that the Project would not cause significant cumulative impacts to vegetation communities in the Merced Canyon. 2 AR 00615, 00641–44.

Finally, Defendants contend that Plaintiffs are incorrect in asserting that the NPS did not discuss staging areas in the EA. Use of five small staging areas is described in the EA and the contract, along with specifics for use and mitigation. 2 AR 00575, 72 AR 07825–828. Further, correspondence in the Administrative Record reflects that post-Project grading would be done on these sites to limit erosion and improve drainage. 9 AR 02335, 72 AR 07825–828. Defendants therefore conclude that Plaintiffs' contentions regarding cumulative impacts are not supported by the Record.

In their Reply, Plaintiffs argue that Defendants improperly failed to adequately evaluate cumulative impacts in failing to consider the impact of the Project in connection with other, similar plans being developed throughout the Park. Plaintiffs discuss the Yosemite Lodge case, and assert that this case is factually analogous. Plaintiffs, however, provide no analysis to support this conclusion.

The court finds that Plaintiffs have not demonstrated that Defendants acted in an arbitrary or capricious manner in evaluating the cumulative impacts from the Project.

*E. Segmenting the Road Project from Related Planning Processes*

Plaintiffs contend that NPS is presently attempting to create a comprehensive transportation plan for Yosemite on a region-wide basis. Plaintiffs contend that

the Project should have been part of the comprehensive and regional planning efforts of the NPS. Plaintiffs contend that instead, Defendants have separated the Project from an overall transportation and Yosemite National Park planning process, attempting to treat it as an isolated effort.

Plaintiffs claim that Defendants' failure to include the Project as part of the comprehensive and regional planning effort has resulted in a failure to evaluate the cumulative land use impacts associated with road improvement, particularly in terms of increased traffic facilitated by the improved road. Plaintiffs disparage NPS reliance on a future, as yet not adopted, vehicle registration system as the basis for concluding that there would be no cumulative adverse impacts. Plaintiffs claim this is a classic case of "segmentation," in which an agency splits a large project into small pieces in order to avoid detailed environmental review.

In response, Defendants state that they assume that in arguing that the Project was improperly segmented out of the overall transportation and Park planning process, Plaintiffs are referring to the Valley Implementation Plan and/or the Yosemite Valley Plan. Defendants contend that the Project had independent utility and was not been improperly segmented from other Park plans.

Defendants contend that Plaintiffs have mischaracterized the scope and intent of the two other Yosemite plans to which they apparently refer: the Valley Implementation Plan and the Yosemite Valley Plan ("the Valley Plan"). Defendants argue first that the Valley Implementation Plan, rather than being "a comprehensive plan for implementing the goals of 1980 General Management Plan" as described by Plaintiffs, was focused on implementing select GMP goals in and for Yosemite Valley. Defendants quote a Federal Register Announcement, 62 Fed.Reg. 60264 (Nov. 7,

1997), which describes the Valley Implementation Plan as presenting proposals for the use and management of the Valley's developed areas in furtherance of goals for the Valley. Defendants further note that the Valley Implementation Plan has been terminated and combined into the Valley Plan.

In regard to the Valley Plan, Defendants argue that rather than being a comprehensive transportation plan for Yosemite as described by Plaintiffs, the Valley Plan focuses on Yosemite Valley, not the entire Yosemite National Park. Defendants quote the Federal Register Notice of Intent for the Valley Plan, which states that the Valley Plan, "consolidates ongoing conservation planning and impact analysis efforts into one plan for the valley." 63 Fed.Reg. 69303 (December 16, 1998). Defendants also argue that the Valley Plan is also not a plan for "regional transportation," a term that refers to movement of visitors between the Park and surrounding areas via public transportation. Defendants argue that the Federal Register Announcement makes clear that the Valley Plan does not include regional transit.

As their second major argument, Defendants argue that the Project does not meet the criteria for consideration with the Valley Implementation Plan or the Valley Plan in a single NEPA document. Pursuant to 40 C.F.R. § 1508.25, actions that are "connected actions" under NEPA have similar "scope" and should therefore be considered in the same NEPA document. Pursuant to 40 C.F.R. § 1508.25(a)(1),

Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

Defendants contend that the objectives of the El Portal Road are entirely separate and distinct from the objectives of the Valley Implementation Plan and the Valley Plan. Defendants argue that the goals of the Project were to stabilize the Road, reduce the likelihood of future Road closure due to floods, facilitate regional transport, and improve safety along the Road. In addition, the EA also contained "minimum standards for any viable alternative" such as maintaining the Road's park-like character and constructing the Road so that buses remain to the right of the center line. 2 AR 00557.

Defendants further argue that in contrast, the goals of both the Valley Implementation Plan and the Valley Plan relate to Yosemite Valley and the planning and operations of valley facilities. Defendants conclude that the Project has independent merit independent of any actions made in connection with the Valley Plan.

Defendants contend that the reconstruction of El Portal Road has "independent utility" and would proceed regardless of the course of the valley planning efforts. The Project is being undertaken to improve the safety of the Road and to correct problems caused by the 1997 flood. 2 AR 00537–38, 4 AR 01107. Defendants argue that the improvements are need to improve safety for existing traffic volumes and do not hinge on whether facilities are relocated in the Valley or moved out of the Valley. 2 AR 00551–55, 4 AR 01124. Defendants argue that for these reasons, the Project did not trigger the new Valley Plan and did not trigger the former Valley Implementation Plan under § 1508.25(a)(1)(i). *See Western Radio Services v. Glickman,* 123 F.3d 1189, 1195 (9th Cir.1997) (projects trigger one another if they cannot function without the other). Similarly, Defendants argue that the second prong found at § 1508.25(a)(1)(ii) of the "connected action" does not apply in this case because the Project has indepen-

dent merit and does not depend on any actions that are taken with regard to facilities in Yosemite Valley.

Finally, Defendants argue that the fact that the Project may complement some of the actions that may be taken in the Valley Plan does not mean that the NPS has engaged in improper segmentation. *See Northwest Resource Information Center v. NMFS,* 56 F.3d 1060, 1067, 1069 (9th Cir. 1995), quoting *Sylvester v. U.S. Army Corps,* 884 F.2d 394, 400 (9th Cir.1989) (projects that could exist without the other, but do benefit from the other's presence, do not violate NEPA's segmentation principles).

■■■ The court concludes that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in segmenting the Road Project from related planning processes.

## F. Deferring Analysis and Mitigation of Impacts

Plaintiffs contend that Defendants improperly deferred analysis and mitigation of impacts to the future. Plaintiffs rely on *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.2d 1372, 1380 (9th Cir.1998), in which the Ninth Circuit held that "NEPA requires consideration of the potential impact of an action before the action takes place." Plaintiffs claim that the EA and FONSI defer developing specific mitigation measures and analysis of impacts and delegate mitigation to the contractor. Plaintiffs further claim that the NPS was also deficient in mitigating impacts on cultural resources.

In response, Defendants contend that this is a repeat of Plaintiffs' arguments opposing the design/build method of reconstructing the Road. Defendants argue that the Supreme Court has held that NEPA does not require adoption of a complete mitigation plan to mitigate environmental

harm before an agency can act, relying on *Robertson v. Methow Valley Citizens,* 490 U.S. 332, 351–53, 109 S.Ct. 1835, 104 L.Ed.2d 351. In *Robertson,* the Court discussed the fact that while NEPA requires an EIS to contain a discussion of steps that can be taken to mitigate adverse environmental consequences, it does not contain a requirement that a complete mitigation plan be actually formulated and adopted at the time of the issuance of the EIS.

In their Reply, Plaintiffs distinguish *Robertson* on the ground that it involved an EIS, not an EA. Plaintiffs argue that once mitigation measures are thoroughly discussed in an EIS, there is no substantive requirement that the agency formulate and adopt a specific mitigation plan, so long as the ultimate decision is sufficiently explained. Plaintiffs cite *Robertson,* at 343, 109 S.Ct. 1835 as support for this proposition. The court can find no reference to the proposition on that page in *Robertson.* Plaintiffs also cite *Jones v. Gordon,* 792 F.2d 821, 829 (9th Cir.1986), in which the court held that the conditions contained in a permit, rather than mitigating environmental consequences, generally operated simply to defer important agency decisions until more information has been obtained. At most, they provided only general guidelines and their effectiveness depended on how they are applied and enforced. Under these circumstances, the court held the agency's decision not to prepare an EIS unreasonable.

In response to Plaintiffs' complaint that some mitigation measures will be implemented and carried out during the course of construction, Defendants cite *Public Util. Com'n of State of Calif. v. F.E.R. C.,* 900 F.2d 269, 282–83 (D.C.Cir.1990), in which the court held that the Federal Energy Regulatory Commission's deferral of decision on specific mitigation steps until the start of construction, when a more detailed right-of-way for the pipeline

would be known, was "both eminently reasonable and embraced in the procedures promulgated under NEPA. See 40 CFR §§ 1505.2(c), 1505.3." Plaintiffs do not discuss this case in their Reply.

Next, Defendants contend that Plaintiffs are wrong in claiming that the EA and FONSI delegated mitigation to the contractor. Defendants argue that the mitigation measures are binding, that the Park Service resources staff was assigned to monitor the reconstruction, and the contracting officer has authority to stop work. Defendants conclude that the NPS mitigation measures were not improperly deferred.

█ Although this issue is connected to Plaintiffs' general contention that Defendants failed to adequately define the Project, Plaintiffs arguments are unconvincing in light of Defendants' responses. The court finds that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in deferring analysis and mitigation of impacts.

*G. Evaluation of Feasible Alternatives*

Plaintiffs contend that Defendants failed to adequately evaluate feasible alternatives to the Project and considered only one alternative; widening the road. Specifically, Plaintiffs first complain that Defendants failed to consider reasonable alternatives presented by NPS' internal documents, recommendations by experts hired by NPS and from its own staff, and many alternatives suggested during the public comment period. Second, Plaintiffs claim that in discussing the need for and alternatives appropriate for the Project, NPS failed to account for the safety improvement measures implemented in the spring of 1997, after the flood. Third, Plaintiffs claim that El Portal Road is not unsafe because while the road has a higher rate of "minor sideswipe accidents," it has the lowest rate of major accidents

compared to every other road in the Park. Plaintiffs argue that the "5 worst curves" on the Road were fixed as part of the Spring 1997 emergency repairs project. Fourth, Plaintiffs claim that NPS did not consider alternatives which would have prohibited oversized vehicles from using the road, although a large proportion of the accidents on the Road involve large buses, trucks and other oversized vehicles.

In response, Defendants contend that in asserting that they considered only one alternative of widening the road, "Plaintiffs completely misapprehend the EA." Defendants argue that the EA made another alternative a major focus of the EA. This is the alternative of leaving the existing roadway unchanged except for emergency repairs. 2 AR 559. The no action alternative was assessed in comparison with the proposed action (11 foot lanes), and a third alternative (12 foot lane with 2 foot shoulder) with respect to each environmental consequence ranging from geology to hydrology, to vegetation, to visitor use, to transportation, to visual resources. 2 AR 610-29.

Defendants argue that once an agency finds a project will not have a significant adverse environmental impact, the range of alternatives an agency must consider is narrower, and cites several cases for this proposition. In *Mt. Lookout—Mt. Nebo Protection Ass'n v. F.E.R.C.*, 143 F.3d 165, 172 (4th Cir.1998), the court held the rigor with which an agency must consider alternatives is less when an agency determines that an EIS is not required. The court notes that 40 C.F.R. § 1508.9(b), provides in part that an "Environmental assessment," "Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." In *Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1558 (2nd Cir.1992), the court reject-

ed an argument that commission had erred by failing to consider a specific alternative to the project. The court stated that "[i]t is well-settled that under NEPA the range of alternatives that must be discussed is a matter with an agency's discretion," and "the range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact."

Finally, Defendants state that the EA set out the minimum standards for any viable alternative, including maintaining the park like character of the route, and allowing buses to stay to the right of the center line. 2 AR 557. Defendants contend that Plaintiffs did not offer any counterproposal meeting those objectives in a timely manner allowing administrative consideration. *See Morongo Band of Mission Indians v. Federal Aviation Administration*, 161 F.3d 569, 576 (9th Cir.1998) (the burden is on the party challenging the agency action to offer feasible alternatives). In conclusion, Defendants argue that the NPS did not commit a clear error of judgment in analyzing the three alternatives set forth in the EA, particularly given the fact that this Project was the reconstruction of an existing road.

In their Reply, Plaintiffs contend that Defendants really considered only one alternative—widening the Road. Plaintiffs argue that the two types of widening were virtually identical and that Defendants did not give careful consideration to the "no action" alternative.

The court concludes that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in evaluation of feasible alternatives. Essentially, Plaintiffs are simply dissatisfied that Defendants chose the alternative they did, rather than one of the alternatives Plaintiffs suggest.

*H. Issues Raised for First Time in Litigation*

Defendants contend that Plaintiffs now attempt to raise for the first time several

issues which were never raised during the public involvement period. Defendants list as issues now raised for the first time the following: 1) from the Declaration of S. Sanders: wetlands, chemical wastes, pollutants, fisheries, Wawona riffle beetles, Bohart's blue butterfly, golden and bald eagles, bats, species of special concern, and not yet listed species; 2) from the Declaration of R. Kattelman: large woody debris, habitat fragmentation, continuity of riverine environment, chemical releases, and transportation engineering analysis. Defendants argue that because Plaintiffs failed to explicitly or meaningfully · raise these issues during the NEPA process, this court should reject Plaintiffs' challenge to the adequacy of the Project EA's consideration of these issues.

Defendants rely on language from *Vermont Yankee Nuclear Power v. Natural Resources Defense Council,* in which review was sought of orders of the Atomic Energy Commission with respect to licensing of nuclear reactors. The Court of Appeals for the District of Columbia Circuit remanded the matter for further proceedings. The Supreme Court reversed, discussing at length the deference which must be accorded administrative agency decisions. The court stated in part:

> "[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made ...; it must show why the mistake was of possible significance in the results...." *Portland Cement Assn. v. Ruckelshaus,* 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), cert. denied sub nom. *Portland Cement Corp. v. Administrator,* EPA, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

*Id.* at 553–54, 98 S.Ct. 1197, 1216–17, 55 L.Ed.2d 460.

NEPA does· set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. See 42 U.S.C. § 4332. See also *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S., at 319, 95 S.Ct., at 2355[45 L.Ed.2d 191]. It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision making unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, *Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), not simply· because the court is unhappy with the result reached. And a single alleged oversight on a peripheral issue, urged by parties who never fully cooperated or indeed raised the issue below, must not be made the basis for overturning a decision properly made after an otherwise exhaustive proceeding.

*Id.* at 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460. *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1334 (9th Cir.1992) ("Greenpeace may not establish a scientific controversy post hoc, through the affidavits of its own scientists and the experts it has hired, when at the time of the Service's action, there existed no substantial dispute that should have alerted the Service to the concerns that Greenpeace now raises"); *Havasupai Tribe v. Robertson,* 943 F.2d

32, 34 (9th Cir.1991) ("The Tribe had some obligation to raise these issues during the comment process. Its views were solicited. Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision."); *City of Angoon v. Hodel,* 803 F.2d 1016, 1022 (9th Cir.1986) (EIS did not have to address an alternative desired by Plaintiffs where Plaintiffs failed to fulfill their responsibility to structure their participation so that it was meaningful and alerted the agency to their position and contentions).

Defendants contend that in the present case, the NPS in its NEPA process for the Project provided the opportunity for significant involvement by the interested public, including Plaintiffs. Provided were a 30–day public comment period on the draft EA, which was extended by ten days; numerous open houses and walk-throughs (some of which Plaintiffs' members attended), and continual status reports via Planning Updates and News Releases. 1 AR 00002–00102, 4 AR 01110; Jenkins Dec. ¶¶ 9, 12–17. Defendants claim that at no time during the public involvement process did Plaintiffs voice explicit or meaningful concerns about the issues set forth above. Defendants argue, therefore, that the court should deny Plaintiffs' contention that the EA did not adequately consider these issues.

In response, Plaintiffs contend in their Reply that the issues raised in this case were raised in the administrative process. Plaintiffs argue that Defendants played "hide the ball" with information that was relevant and pertinent to the public review process, including geotechnical date, species surveys, the Biological Assessment, the revegetation plans and the request for proposal that described the design/build process. Plaintiffs imply that it is inherently unfair to criticize them for failing to raise this issues, when Defendants hid their existence.

Plaintiffs further contend that despite Defendants' failure to provide needed information, members of the public fully exhausted their administrative remedies. Specifically, the National Parks Conservation Association was concerned that the Project "does affect analysis of impacts to habitat ... riparian systems, vegetation; and sensitive species." 3 AR 00678. A member of the Sierra Club raised issues about wildlife and sensitive species. 3 AR 00684. Plaintiffs argue that while specific mention of Wawona riffle beetles, the Bohart's blue butterfly, golden and bald eagles, and bats may not have been provided, the comments still put the NPS on notice to address these species, as these are the same species identified in the correspondence with the Fish and Wildlife Service. 5 AR 0214, 0215, 01222, 01233. Specific concern with spotted owls was raised. 3 AR 00686. Concern about the lack of biological surveys was raised. 3 AR 00687. Concern about Hydromantes and Bufo species as well as mountain king snakes and mountain beavers was expressed. 3 AR 00700. Concern about impacts to the river and its habitat were expressed. 3 AR 00710. Finally, the issue of air pollution, toxic chemicals and pollutants were raised, as was the need for transportation engineering analysis. 3 AR 00711, 3 AR 00712 to 714. Plaintiffs argue that all of this was sufficient to put Defendants on notice regarding the issues that are raised in this action.

The court finds that Plaintiffs are correct and that Defendants have not demonstrated that Plaintiffs are precluded from raising any issues because of failure to exhaust administrative remedies.

█ In summary, the court finds that Plaintiffs have demonstrated the existence of substantial questions as to whether the Project may have a significant effect on the environment. These substantial questions rest on a showing of

substantial disagreement between experts and issues involving biological resources, including biological surveys, the revegetation plan, bat species, and trout. These substantial questions also rest on issues involving enroachment into the river and riparian habitat, and Cascade Dam. As set forth in *Sierra Club v. United States Forest Service,* 843 F.2d at 1193, in reviewing an agency's decision not to prepare an EIS, "a determination that significant effects on the human environment will in fact occur is not essential." *Id.,* quoting *Foundation for North Am. Wild Sheep v. U.S. Dep't of Agriculture,* 681 F.2d 1172, 1178 (9th Cir.1982). "If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." Because Plaintiffs have demonstrated the existence of such substantial questions, the court must conclude that Defendants' decision not to prepare an EIS was arbitrary and capricious, and in violation of the Administrative Procedures Act. The court will grant Plaintiffs summary adjudication on these issues and will issue a corresponding declaratory judgment. The issue of injunctive relief will be discussed below.

## II. DEFENSES

### A. Laches

#### 1. Diligence in Bringing Action

In their counter-motion and opposition, Defendants contend that Plaintiffs' claims are barred by laches. Defendants point out that the EA challenged by Plaintiffs was issued by the NPS on August 22, 1997, yet this action was not filed until 18 months later, on February 19, 1999. Defendants also argue that Plaintiffs' members' frequent travel over the Road gave them the opportunity to act promptly if they felt the Project was not being implemented properly.

In the one Ninth Circuit environmental case cited by the parties in which laches was imposed, the court stated.

To demonstrate laches, a party must establish (1) lack of diligence by the party against whom the defense is asserted, and (2) *Lathan v. Brinegar,* 506 F.2d 677, 692 (9th Cir.1974) (en banc) (quoting *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961) (emphasis added)); accord *Daingerfield Island Protective Soc'y v. Lujan,* 920 F.2d 32, 37 (D.C.Cir. 1990), cert. denied, 502 U.S. 809, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *Portland Audubon Soc'y v. Lujan,* 884 F.2d 1233, 1241 (9th Cir.1989).

In environmental cases, such as those brought under NEPA, however, it is recognized universally that these criteria must be applied in light of the principle that "[l]aches must be invoked sparingly" in suits brought to vindicate the public interest. *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982); accord *Daingerfield Island,* 920 F.2d at 37; see also *Portland Audubon Soc'y,* 884 F.2d at 1241 (citing numerous circuits that have adopted this principle).

*Apache Survival Coalition v. United States,* 21 F.3d 895, 905–906 (9th Cir.1994).

In addition to the fact that the NPS issued the FONSI for the Project on August 28, 1997, the Department of Transportation awarded the reconstruction contract on June 1, 1998, and the NPS publicized the contract award July 20, 1998. On-site surveying began September 8, 1998. Zanetell Dec., May 19, 1999, ¶ 2. Notice of the issuance of the FONSI and the Project's approval by the NPS Regional Director was included in Planning Update # 8 (Summer, 1997). 1 AR 00077, Jenkins Dec., May 20, 1999, ¶¶ 12–13. The Planning Update stated, "Construction is projected to begin on December 1, 1997." 1 AR 00078–80. Plaintiffs acknowledge that two members of the Sierra Club's Yosemite Committee received Planning Updates on a regular

basis. Declarations of Greg Adair ¶ 4 and Joyce Eden ¶ 3. Defendants argue that regardless of whether some of Plaintiffs' members eventually received the revised EA and FONSI, the Planning Updates gave Plaintiffs contemporaneous notice that the Project "was ready to move forward." 1 AR 00077.

In regard to the notice of the issuance of the FONSI and the Project's approval by the NPS Regional Director in the Planning Update, Plaintiffs assert that no specific reference to the FONSI is included. Rather, the Planning Update states, "The environmental assessment has been completed and the final plan approved by the Regional Director. Great care has been taken to address environmental, scenic, cultural and recreational concerns." 1 AR 00077. The reference to "environmental assessment" is not capitalized, while the later reference to the "draft Environmental Assessment," is capitalized. 1 AR 00079. Plaintiffs argue that only "someone sophisticated enough to know the in's and out's of planning documents" would understand that "the final plan approved" meant that a FONSI was released. Plaintiffs argue that there is no notice in this Planning Update that a revised EA or FONSI was released and there was no solicitation for further comment or review.

In response to Defendants' claim that Plaintiffs delayed for 16 months before filing the present litigation, Plaintiffs claim, without explanation, that Defendants changed the Project in later 1998. Plaintiffs further argue that the Project did not commence until September 1998, and it was not until that time that the evidence of the impact of the Project was revealed. Plaintiffs then filed suit a few months later.

Defendants also argue that additional public involvement efforts undertaken by the NPS demonstrate the unreasonableness of Plaintiffs' claim that they did not have sufficient notice about the Project. These include four open houses about the Project held by the NPS in May and June of 1997. 1 AR 00046, 00065. Ron Mackie, one of Plaintiffs' declarants, and one other Sierra Club member attended the open houses. 1 AR 00059–60. The NPS also hosted a walk-through of the Project corridor for agency representatives and environmental groups which two Sierra Club members attended. Jenkins Dec. ¶ 9; McKinley Dec. ¶¶ 4–5. Further, the NPS distributed Planning Updates and News Releases that summarized the scope of the Project, advised the public of the Project's approval, and provided information on the award of the contract and the start date for construction. 1 AR 00028–46, 1 AR 00066–71, 1 AR 00077–82.

Seven Sierra Club members have submitted declarations complaining that they were not given appropriate notice of the status of the Project and they did not receive various Project documents from the NPS, particularly the revised EA and FONSI. Defendants submit the declaration of Laurette Jenkins, who states that of the seven declarants, only Mr. Rasmussen, Mr. Mackie and Ms. McKinley submitted comments on the draft EA for the Project. Jenkins Dec. ¶¶ 5, 8, 16. This is the case even though Ms. Eden, Ms. Elbers and Mr. Adair admit receiving the draft EA. Adair Dec. ¶ 4; Elbers Dec. ¶ 4; Eden Dec. ¶ 3. Ms. Jenkins explains that NPS only sends final EAs and FONSIs to people who comment on draft EAs. Jenkins Dec. ¶¶ 4, 16. NEPA does not require EAs to be distributed to the public. 40 C.F.R. § 1506.6(b).

In response to Defendants' arguments based on the Jenkins Declaration, Plaintiffs claim that there is no independent verification in the Record of the statement made by Ms. Jenkins. Plaintiffs claim that the Record does not even verify that the mailing lists Jenkins references are in fact what they claim to be. Defendants

argue that if the NPS has such an established system of notification, the Record would specifically identify the purposes of the lists, but it does not. Plaintiffs conclude that all that has been offered is the hearsay evidence of Ms. Jenkins, which they allege is disputed by several people who attempted to participate in the review process.

In specific response to the complaints raised in the Elbers Declaration, Defendants claim that Ms. Elbers did not comment on the draft EA and was only on the NEPA II list, for Planning Updates and News Releases. Jenkins Dec. ¶ 7. Defendants assert that numerous Planning Updates and News Releases provided details about the status of the Project. Jenkins Dec. ¶¶ 12–13, 15–18. Defendants argue that Ms. Elbers could have sought more information at any time by contacting the Park at the phone number provided, but she did not do so. Finally, Defendants point out that Plaintiffs fail to address in their briefs the fact that the Administrative Record contains the names of six other Sierra Club members on the NEPA I list, two of whom submitted comments on the draft EA and who were mailed copies of the revised EA and FONSI. 1 AR 00116–23; Jenkins Dec. ¶ 9. Defendants conclude that they are entitled to the assertion of laches against Plaintiffs, because Plaintiffs have failed to structure their participation in the Project so that it is meaningful, as required by *Vermont Yankee* and *Morongo Band of Mission Indians.*

In their motion, Plaintiffs contend that they have diligently prosecuted this action. Plaintiffs cite *Preservation Coalition v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982) which described the analysis for the application of laches in environmental cases as follows:

> The factors that should be considered in determining diligence in this type of

case are (1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action.

Because application of laches is discretionary, the standard of review on appeal is whether the district court properly found (a) lack of diligence by the party against whom the defense is asserted, and (b) prejudice to the party asserting the defense. *Coalition for Canyon Preservation,* 632 F.2d at 779, citing *Lathan v. Brinegar,* 506 F.2d 677, 692 (9th Cir.1974) (en banc). To support its finding of lack of diligence, the district court determined that the last "major federal action" occurred when HUD signed the R–5 contract in 1971 and that the Coalition failed to press its claim until September 24, 1979. See *Chick v. Hills,* 528 F.2d 445 (1st Cir.1976); *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa. 1978), aff'd. without opinion, *Sworob v. Harris,* 578 F.2d 1376 (3d Cir.1978), cert. denied, *Sworob v. Harris,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). The passage of eight years since the BRA and HUD signed the loan and grant contract was the rock on which the district court rested its finding of lack of diligence.

We believe the district court accorded too much significance to the eight year period. The factors that should be considered in determining diligence in this type of case are (1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action. *Coalition for Canyon Preservation,* 632 F.2d at

779 (citing *City of Davis,* 521 F.2d at 673).

While each of these factors cannot be fitted precisely to the facts of this case, it should be pointed out that no buildings were placed on the National Register of Historic Places until 1974, that the Eastman Building was not so placed until 1978, and that the decision to demolish the Eastman Building was not made until May 1979. Thereafter, the Coalition promptly complained to HUD about the need for an EIS before destroying an historic building. When HUD announced that no EIS was required, the Coalition immediately filed this action.

These facts clearly indicate that 1971 is not the relevant date for determining whether the Coalition's historic preservation and funding conversion arguments in support of its NEPA claim are barred by laches. The Coalition did not know that any historic building would be demolished until May 1979. The funding conversion occurred in the same year. Moreover, before bringing suit the Coalition told the BRA it opposed the project and its suit promptly followed a public meeting on the proposed destruction of the historic buildings. These facts demonstrate the degree of diligence required by *Coalition for Canyon Preservation,* 632 F.2d at 779.

Furthermore, even with respect to those aspects of the project known in 1971 that the Coalition challenges, the BRA has not shown sufficient prejudice to invoke laches. Delay may be prejudicial if substantial work has been completed before the suit was brought, but even substantial completion is sometimes insufficient to bar suit. See, e.g., *City of Davis,* 521 F.2d at 670 n. 11 (highway interchange 50% completed). Although the amount of money expended and work completed may indicate how difficult it would be to alter the plan of the project, *Coalition for Canyon Preservation,* 632 F.2d at 779, increased cost from delay is alone not sufficient to establish prejudice. In enacting NEPA Congress contemplated that some delay would necessarily occur in the process of identifying potential environmental harm. *Id.* at 780; see *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 868–69 (5th Cir.1975). Here, however, although four square blocks were leveled for the Boise project in 1971, no construction has taken place. The project cannot be considered close to completion. Cf. *City of Rochester v. United States Postal Service,* 541 F.2d 967, 977 (2d Cir.1976) (EIS required for post office 35% completed). It follows that laches bars none of the Coalition's claims.

Plaintiffs list the same items discussed by Defendants as proving that Plaintiffs had notice of the Project and argue that these demonstrate that they notified NPS of their position with regard to the El Portal Project early in the process. These include submitting comments on the Draft EA and attending site walk-throughs. Plaintiffs assert that they were on "several mailing lists in order to receive all environmental documents and notices relating to the El Portal Road project," and in some cases made personal phone calls and special requests to Park employees to receive documents. Sierra Club Plaintiff members Adair, Cogswell, McKinley, Elbers, Eden, Makie and Rasmussen submit declarations declaring under oath that they did not receive the Final EA. Plaintiffs argue that Defendants offer no evidence that Plaintiffs actually received or had notice of the availability of those documents.

Plaintiffs contend, relying on the Eden Declaration that once construction began and they became aware of the significant impacts involved in the Project, they sent Freedom of Information Act requests to the NPS to acquire any environmental or mitigation documents for the Project, be-

gan searching for an attorney to investigate their legal options, staged protests and began letter writing campaigns to halt the Project.

Plaintiffs contend that "[a]lthough the legal basis for plaintiffs' claims may have become available upon issuance of the final mitigated FONSI, the need for this litigation came from plaintiffs' first realization of the massive destruction being perpetrated on the protected Merced River corridor by the National Park Service, evidenced by the actual construction." Declarations of Adair, Cogswell, McKinley, Mackie, Elbers, Eden, and Rasmussen. Plaintiffs claim that the EA does not include any detailed mapping of the project and does not adequately analyze the exact nature and extent of impacts. Plaintiffs argue that they were entitled to assume the NPS had complied with NEPA and cannot be expected to challenge every project which in some way violates the law. Plaintiffs assert that they are non-profit, volunteer-based organizations which must use their sparse resources efficiently to challenge the most egregious projects proposed by the federal government.

Plaintiffs contend that the present case is distinguishable on the facts from *Apache Survival Coalition v. United States,* 21 F.3d 895 (9th Cir.1994), the apparently single environmental case in which the Ninth Circuit upheld the imposition of laches. In *Apache Survival Coalition,* a tribal coalition challenged the issuance of the permit for implementation of the first phase of construction of an astrophysical complex on an Arizona mountain. When the Tribe's input was solicited concerning the mountain and its cultural resources, the Tribe's only response was to seek assurances that its property rights would be protected. The Ninth Circuit further explained the facts justifying the application of laches as follows:

> In this case, the Tribe (and thus members of the Coalition) had been informed in the mid–1980s that telescopes might be constructed on Mount Graham and yet purposefully shunned the NHPA process. Moreover, the Tribe did not bring suit until more than two years after the issuance of the special use permit. Finally, although the Tribe informed the Forest Service briefly and in general terms that it had objections to the issuance of the permit prior to filing suit, it ignored the Forest Service's prompt expression of its willingness to listen to the Tribe's concern's and proposals. The members of the Tribe then delayed filing for well over a year, and, all the while, construction of the facilities on Mount Graham proceeded apace.

*Id.* at 909. Plaintiffs argue that in contrast, they have "kept a watchful eye" and have participated in all planning processes, but did not have the information necessary with respect to the El Portal Project to decide whether it was advisable to expend legal resources on litigation.

Defendants contend that another avenue through which information about the Project was available was the media. Defendants argue that newspaper coverage of the Project was extensive in Mariposa and the Central Valley. Jenkins Dec. ¶¶ 20–21. Several articles prominently featured this court's September 30, 1998 decision to deny Mariposa County's request to preliminarily enjoin the Project. Jenkins Dec. ¶¶ 21. Defendants assert that they "are unaware of any case in which a plaintiff has stood by after someone else unsuccessfully sought to challenge the same environmental document under the same law." Defendants argue that "[h]ad the plaintiffs been paying attention (particularly MERG's local residents), these articles and the news about the Mariposa County case should have prompted more decisive and timely action."

Centering in on Plaintiff MERG, Defendants contend that MERG seems to have

acted in the same manner as the plaintiffs in *Apache*. MERG did not submit comments on the draft EA. # AR 00672–00954. Defendants assert that MERG's only action to effect change in the manner that the Project was proceeding was to protest with the Sierra Club after construction had begun. Mackie Dec. ¶ 6. Defendants argue, however, that the numerous News Releases, Planning Updates, and media stories discussed above put MERG on notice about the Project more than twenty months before MERG took any action to protect its legal rights.

Defendants argue that MERG's inaction is even more egregious when Plaintiffs' own admissions are considered. Plaintiffs' First Amended Complaint states that MERG'S members, who live in and around Mariposa County, use the Park on a "regular basis" and that they "regularly use the El Portal Road." First Amended Complaint, ¶ 16. Ron Mackie, a MERG member, states that he drives the El Portal Road on a "weekly" basis. Mackie Dec. ¶ 4. Defendants argue that based on these admissions, Plaintiffs' statements that they were unaware of the Project's approvals, or the nature of the impacts, defy logic. Defendants argue that like in *Apache*, this case exemplifies a situation where the agency "was attempting to follow the applicable procedures by notifying and seeking input from all possibly interested parties. While the process moved forward, the members of [MERG] remained virtually silent." *Apache*, 21 F.3d at 908. Thus, MERG "ignored the very process that its members now contend was inadequate." *Id.* at 907.

In response, Plaintiffs contend in their Reply that the MERG Plaintiffs cannot be analogized to the plaintiffs in *Apache*. Plaintiffs argue that they did submit comments on the Project, relying on paragraph 11 of the Jenkins Declaration. In this paragraph, Ms. Jenkins states that the first time the NPS became aware of

MERG's concern regarding the Road Project was in a Valley Implementation Plan comment letter prepared by MERG president Barton A. Brown, M.D. on January 30, 1998. The letter questions how the Project could have been found to have little environmental impact, "when the footprint ... will be considerably larger?"

The court finds that the fact that Brown sent this letter in January of 1998 does nothing to preclude the imposition of laches in this case. Rather, it goes to show that MERG's president had knowledge of one of the alleged defects in the Project now argued by Plaintiffs one entire year before this action was filed.

Finally, Defendants contend that two comments letters sent to the NPS in early 1998 by Sierra Club member and declarant Mr. Adair and MERG President Barton Brown further undermine Plaintiffs' contention that their concerns over the Project arose recently. Mr. Adair and Mr. Brown submitted comments on the Valley Implementation Plan, which was an EIS for improvements in Valley facilities and transit operations. Jenkins Dec. ¶¶ 5–6, 11. In their letters, which were dated February 1998, and January 1998, respectively, Mr. Adair and Mr. Brown raised concerns about improper "segmentation" and the magnitude of the Project's impacts. Jenkins Dec. ¶¶ 5–6, 11. However, the present action was not filed until a year later.

In summary, Defendants argue that the extent of the NPS's efforts to apprise the public about the status of the Project contrasts sharply with the Plaintiffs' lack of regard for their own interests. Defendants contend that Plaintiffs' delay defies reason and is therefore inexcusable.

Defendants distinguish three cases relied upon by Plaintiffs: *Portland Audubon Society v. Lujan*, 884 F.2d 1233 (9th Cir. 1989), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989); *Coalition*

*for Canyon Preservation v. Bowers,* 632 F.2d 774 (9th Cir.1980), and *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975). Defendants argue that the conduct of Plaintiffs Sierra Club and MERG bear no resemblance to the plaintiffs in those cases. As to *Portland Audubon,* Defendants stress that the plaintiffs filed an administrative appeal concerning the project they were opposed to before any change in the status quo occurred. *Portland Audubon,* 884 F.2d at 1241. The court also found that there would be no prejudice to the government because project work had not begun. *Id.* In *Coalition for Canyon Preservation,* the plaintiffs had begun protesting the project more than one year before it was approved. *Id.* at 780. Further, the site impacts that had occurred were within the boundaries of the smaller project that the Coalition had supported. *Id.* at 781. In *City of Davis,* a primary factor was that the court excused the City's ignorance of its rights under NEPA, because NEPA was then a new statute. *Id.* at 678. This, of course, is no longer the case.

In opposition to Defendants' contention that they failed to diligently pursue this litigation, Plaintiffs assert repeatedly that they did not initially realize the true impact and extent of the Road Project until after the construction actually began. Plaintiffs allege that this is because Defendants played "hide the ball" with them, failing to disclose the full extent of the Project in the draft EA, on which public comment was invited. Specifically, Plaintiffs claim that the NPS's public characterizations of the Project and the walk-throughs did not disclose the true impacts to the Canyon, River, hydrology, geology, ecology, riparian, woodland zones and plant and animal species. Plaintiffs also argue that the Draft EA did not list the Phase I Design Plans. 2 AR 00411. Plaintiffs acknowledge that the Revised EA did list the Phase I Design Plans, but

argue that they had no opportunity to comment upon it and did not receive it until January of 1998.

■ After reviewing all of the arguments of the parties, their citations to the record, and all supporting authorities, the court finds that Defendants have demonstrated a certain lack of diligence on the part of Plaintiffs. However, the court does not find that this lack of diligence is of a degree such as would support a finding of laches, particularly in light of the undisputed principle that laches should be invoked sparingly in cases, such as those under NEPA and WSRA, which are brought to vindicate the public interest.

### 2. Prejudice

Defendants contend that the second element is met because Plaintiffs' delay in bringing this action is unduly prejudicial. Defendants note that in denying Plaintiffs' request for a TRO, this court stated that serious hardship would occur if the Project were halted.

In their Reply, Plaintiffs assert that Defendants cannot assert hardship at this time. Plaintiffs state as follows: "The plaintiffs failed in the attempt to enjoin the entirety of the project, and recognize that certain aspects of the project must now go forward in order to prevent even more damage." Reply, 68:24–26. In their Supplemental Brief, Plaintiffs set forth in detail the exact injunctive relief they seek as to Segments A, B and C.

Plaintiffs argue that a different analysis applies to Segment D of the Project. Plaintiffs assert that Section D concerns the removal of Cascade Dam and that work on this section has not yet begun. Plaintiffs assert that no prejudice will accrue to Defendants if the court enjoins that section of the Project.

### a. work virtually done

Defendants explain that the Project is divided into four Segments: A, B, C and

D. Zanetell Dec. ¶ 9. Defendants, relying on the Zanetell Declaration, claim that heavy earthwork activities "that define the overall foot print and disruptive impact of the Project are virtually complete in Segments A, B and C." Zanetell Dec. ¶ 11. Together, these segments make up. the vast majority of the Project's length. *Id.* at ¶ 9. Clearing of trees and. vegetation in Segments A, B and C is 97% complete. Zanetell Dec. ¶ 11. Excavation work is approximately 90% complete in Segment A, 98% complete in Segment B, and 95% complete in Segment C. *Id.* at ¶ 11.

The Project also involves "downslope activities" bordering the Merced River. These activities include mechanically placed rock embankments, Mechanically Stabilized Earth retaining walls ("MSE Walls"), and riprap bank stabilization and protection. *Id.* at ¶¶ 5, 11. Downslope activities are approximately 65% complete in Segment A, and 95% complete in Segments B and C. *Id.* at ¶ 11. Defendants assert that these heavy-earthwork activities have altered the character of the Project site by expanding the Road's footprint beyond its former width, as called for in the EA's proposed action and approved in the FONSI. . Defendants argue, therefore, that the Road widening which Plaintiffs protest has in large measure become irreversible. *See Apache*, 21 F.3d at 913.

Defendants contend that, ironically, much of the work that remains to be done, and that would remain undone if an injunction were issued, is work designed to minimize the environmental and aesthetic impacts of the construction. These activities, which are mitigation measures for the project, include activities such as revegetation with native plants, final slope contouring, a new drainage system, construction of a simulated stone guard wall, and sculpted concrete fences on the cut and fill walls to blend with surround rock. These mitigation measures and contract requirements were included in the RFP and are thus binding on the contractor. Zanetell Dec. ¶ 13.

In response, Plaintiffs argue in their Reply that while the footprint of the Road may be in place, mitigation measures remain to be effectuated and that the opportunity for relief lies in that area.

*b. unanticipated environmental impacts*

Defendants contend that halting the project at this time would cause unanticipated environmental impacts. Defendants explain, based on the Delaney Declaration, that the Project's contractor, is required to implement temporary mitigation measures until the permanent mitigation measures are applied. These temporary measures are to minimize construction-related erosion and run-off. Because many slopes in the Project area are unstable and unvegetated, the contractor is required to channel runoff to silt fences and filter dikes that remove sediment in accordance with the Project's Clean Water Act Section 404 Permit. Defendants claim that the inability to continue maintaining these mitigation measures could lead to water quality violations. As stated in the Delaney Declaration, the NPS's maintenance staff would be unable to maintain these mitigation measures, particularly after rain or snow, due to the magnitude of the effort required to maintain the Road in a partially completed state and because of responsibilities elsewhere in the Park.

In summary, Defendants claim, based on the Jenkins Declaration, that stopping the Project in the middle of construction could result in unanticipated and undesirable environmental impacts, particularly to water quality in the Merced River canyon.

In response, Plaintiffs argue that certain aspects of the Project can be halted without causing environmental harm.

*c. halting project would create hazard*

Defendants contend that in its current condition, the road is not safe for extended

or indefinite unrestricted public access. Many sections of pavement are missing, guardrails have been removed, and there are many hazardous drop-offs. Zanetell Dec. ¶ 14, Delaney Dec. ¶¶ 3–5. Some areas are reduced to one-way travel, and the Road lacks a standard alignment, forcing traffic to wind through construction features. Defendants claim that if construction work were halted, these conditions would make travel to and from Yosemite unpredictable and hazardous. Delaney Dec. ¶¶ 4–5.

Additionally, Defendants contend that if the Project were stopped now, the public would be harmed because many of the measures designed to minimize the impacts of construction and improve the aesthetic quality of the reconstructed Road would not be implemented. Zanetell Dec. ¶ 19; Delaney Dec. ¶ 8. For example, Defendants argue that revegetation and the aesthetic treatments like sculpted concrete faces on cut and fill walls and simulated stone guardwalls would be sacrificed. Defendants argue that instead, features like temporary concrete barriers would be used and would markedly change a visitor's experience of the Park. Delaney Dec. ¶ 8.

### d. costly to halt project now

Again relying on the Zanetell Declaration, Defendants assert that the Federal Highway Administration has already paid the Project's contractor $12.6 million and another $1.5 million payment is forthcoming. Zanetell Dec. ¶ 8. Mr. Zanetell estimates that it would cost nearly $8,920,000.00 to halt this Project now. This figure includes anticipated contract termination costs, such as demobilization of the Project, payment on work to date, and costs to resolve the termination of the contract) as well as the costs to establish a minimally safe Roadway. According to Mr. Zanetell, it would take $4,200,000.00 to re-establish a safe and stable roadway with adequate drainage

and erosion control. Defendants argue that given that the activities with the most impact are virtually complete, expenditures of this magnitude would be extremely wasteful. Defendants cite the court to *Apache Survival Coalition v. United States*, 21 F.3d 895, 912 (9th Cir. 1994), wherein the court discusses that amount of money spent on a project and degree to which the completion is complete are factors to consider in evaluating prejudice for the purposes of laches in analogous construction cases. Defendants stress that costs of less than half the amount of those at issue here persuaded the Ninth Circuit to apply laches in *Apache*.

In response, Plaintiffs contend in their Reply that the protection of a national treasure like Yosemite affected this project "should not be held hostage by costs considerations." Plaintiffs argue vaguely that "the project monies should be dedicated to remedying the wrong, while adequate environmental review is done."

After reviewing all of the parties' contentions and supporting authorities, the court concludes that Defendants have demonstrated prejudice. However, in light of the court's finding that Defendants have not demonstrated a lack of diligence on the part of Plaintiffs sufficient to support the imposition of laches, and the rule that laches be invoked sparingly in cases brought to vindicate the public interest, the court will not impose laches in this case. The prejudice demonstrated by Defendants is a factor which will be considered in the balancing test applied in considering Plaintiffs' request for an order enjoining further work along the Merced River corridor.

### B. Mootness

Defendants contend that relief should not be granted because in the action is moot. Defendants assert that in three of the four Road sections, vegetation removal

is 95% complete, and retaining walls, rock embankments, and river bank stabilization is 30% to 95% complete. Thus, Defendants argue that the physical changes contemplated by the EA have taken place and cannot be undone. Defendants conclude that the alleged injury which Plaintiffs seek to redress—approval of the Road reconstruction based on a FONSI, cannot now be undone.

Defendants contend that both Article III mootness and the doctrine of "prudential mootness" apply in the present case, relying on *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727–28 (10th Cir. 1997), in which the court explained as follows:

> Article III mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 1069, 137 L.Ed.2d 170 (1997) (quoting Henry Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)). A federal court has no power to give opinions upon moot questions or declare principles of law which cannot affect the matter in issue in the case before it. *Church of Scientology of California v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 449–50, 121 L.Ed.2d 313 (1992). Thus, to be cognizable, a suit must be "a real and specific controversy admitting of specific relief through a decree of a conclusive character." *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)). If an event occurs while a case is pending that heals the injury and only prospective relief has been sought, the case must be dismissed. *Fund for Animals v. Babbitt,* 89 F.3d 128, 133 (2d Cir. 1996).

> Closely related to Article III mootness is the "prudential mootness" arising from doctrines of remedial discretion. Prudential mootness addresses "not the power to grant relief but the court's discretion in the exercise of that power." *Chamber of Commerce v. United States Dep't of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). In some circumstances, a controversy, though not moot in the strict Article III sense, is "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Id.* We have expressly recognized the doctrine of prudential mootness, and have stated that it has particular applicability in cases, such as this one, where the relief sought is an injunction against the government. *Building & Constr. Dep't v. Rockwell Int'l Corp.,* 7 F.3d 1487, 1492 (10th Cir.1993); *New Mexico v. Goldschmidt,* 629 F.2d 665, 669 (10th Cir. 1980). Under both Article III and prudential mootness doctrines, the central inquiry is essentially the same: have circumstances changed since the beginning of litigation that forestall any occasion for meaningful relief. 13A Charles Alan Wright et al., Federal Practice and Procedure S3533.3 (2d ed.1984).

■ In their Reply, Plaintiffs argue simply that the present case is not moot, because effective relief can be granted in the form of injunctive and declaratory relief on both the NEPA and WSRA claims. As discussed *infra* under the heading "Relief," the court concludes that relief is available to Plaintiffs. Accordingly, the court rejects as meritless Defendants' contention that this action is moot.

### C. Stare Decisis and Issue Preclusion

Defendants contend, as they did in response to Plaintiffs' request for a TRO,

that both the WSRA claim and the NEPA claim are precluded by prior litigation. In regard to the WSRA claim, Defendants argue that the same plaintiff, the Sierra Club, challenged other Yosemite projects under both WSRA and NEPA in *Sierra Club v. United States*, 23 F.Supp.2d 1132 (N.D.Cal.1998) ("the Yosemite Lodge case"). Although in that case the court granted a preliminary injunction under NEPA, the court rejected Plaintiff's claim for injunctive relief based on the Defendants' failure to adopt a Comprehensive Management Plan, as required under WSRA. The court held as follows:

> The above-cited cases are dispositive of the issue at hand. The WSRA provides no indication that a court may enjoin an agency's land management activities with respect to a wild and scenic river area merely because the agency has failed to timely adopt a comprehensive management plan. A less drastic remedy has been, and continues to be, available. Throughout the twelve years in which the NPS has failed to discharge its procedural · obligations under the WSRA, plaintiff has had every opportunity to bring suit under Section 706(1) of the Administrative Procedure Act to require the agency ·to adopt a CMP. Beyond this, however, there is no remedy available to plaintiffs for this procedural violation.

*Sierra Club v. United States*, 23 F.Supp.2d at 1138. In the present case, Plaintiffs again seek, in part, injunctive relief based on Defendants' failure to adopt the Comprehensive Management Plan required under WSRA. Defendants argue, therefore, that under the principle of stare decisis, this court should follow the Yosemite Lodge decision and should reject Plaintiffs' WSRA claim.

In regard to the County of Mariposa case, Defendants simply argue that like the present case, it involved an attempt to enjoin reconstruction of the Road under the EA. Defendants assert that Plaintiffs now seek to relitigate the same issue—the legal sufficiency under NEPA of the same EA for the same project. Defendants argue that "giving certainty to completed administrative proceedings, providing expeditious completion of public works, and maintaining judicial economy" all point to requiring initiation of all legal challenges to one project at the same time. Defendants cite no authority for this proposition.

In addition, Defendants argue that under the two earlier cases, Plaintiffs are precluded by collateral estoppel or issue preclusion from relitigating the issue of injunctive relief under WSRA and the sufficiency of the EA for the El Portal Road Project. *See Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C.Cir. 1992), *cert. denied*, 506 U.S. 1078, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993).

Defendants argue that although the prior rulings they rely on arose from preliminary injunction proceedings, as opposed to final judgments following a trial on the merits, such rulings may warrant issue preclusion if they were "sufficiently firm." *See, Commodity Futures Trading Com'n v. Board of Trade*, 701 F.2d 653, 657–8 (7th Cir.1983) (holding that findings made in a decision on preliminary relief do have given en preclusive effect if the circumstances make it likely that the findings are accurate, reliable); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995–96 (7th Cir.1979), *cert. denied* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980) (holding that although a judgment from an appeal from a preliminary injunction order will ordinarily not foreclose subsequent litigation on the merits, it will be given preclusive effect if it is necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits).

In regard to the decision in the Yosemite Lodge case, Defendants contend that

the ruling that the plaintiffs had no injunctive remedy based on the failure to adopt a Comprehensive Management Plan was sufficiently firm to be given preclusive effect. In regard to this court's decision in the County of Mariposa case, Defendants claim that the court is in the best position to determine whether its ruling in the County of Mariposa case is "sufficiently firm" to now be given preclusive effect. Defendants refer to the court's reference, as a basis for finding that County of Mariposa had not made a showing of likelihood of success on the merits, to the proposition that an EIS is not required when there is no change to the physical status quo.

The court finds that Plaintiffs are not collaterally estopped from raising any WSRA claim by the decision in the Yosemite Lodge case. While Plaintiffs do claim, as was claimed in the Yosemite Lodge case, that Defendants have violated WSRA by failing to adopt a Comprehensive Management Plan, Defendants fail to note that Plaintiffs have also made a substantive claim under WSRA. Specifically, Plaintiffs claim that NPS has violated provisions of WSRA by approving the Project within the protected corridor of the Merced River by failing to protect and enhance the values of the Merced River and violating WSRA's mandate that NPS protect the river's free-flowing condition. The court finds, therefore, that Defendants have failed to demonstrate at this time that Plaintiffs are precluded from bringing all WSRA claims by the decision in Yosemite Lodge case.

In regard to the County of Mariposa case, the court concludes that Defendants' legally unsupported argument that Plaintiffs should now be precluded from pursuing this action because they did not intervene in that earlier case is unpersuasive. The County of Mariposa case dealt primarily with the propriety of Defendants' decision to change from a three-year construction schedule to a two-year construction schedule and the impact of that decision on local businesses and travel. This is clearly distinguishable from the present case.

In light of the above, the court finds that neither stare decisis nor issue preclusion apply to prevent Plaintiffs from litigating the present action.

In summary, the court rejects Defendants claims based on the defenses of laches, mootness, stare decisis and issue preclusion, and concludes that none of these defenses bar Plaintiffs' claims.

## III. NATIONAL PARK SERVICE ORGANIC ACT

### A. Background

The National Park Service Organic Act ("the Organic Act") of 1916 establishes the National Park Service to "promote and regulate the use of the Federal areas known as national parks, monuments and reservations hereinafter specified, ... to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Plaintiffs allege Defendants have violated the Organic Act because "construction involved in expanding the El Portal Road is permanently altering the Merced River Canyon, within the boundaries of Yosemite National Park, inconsistent with the mandates and limitations imposed on the National Park Service by the Organic Act, 16 U.S.C. § 1 *et seq.* and by the regulations and policies promulgated thereunder." Plaintiffs' Memorandum at 44.

### B. Analysis

The Organic Act commits the NPS to the protection and furtherance of two fun-

damentally competing values; the preservation of natural and cultural resources and the facilitation of public use and enjoyment. These competing values of conservation and public use have been actively in conflict since before the establishment of the NPS. The Organic Act did not resolve the conflict in favor of one side or the other. *See* Nathan L. Scheg, *Preservationists vs. Recreationists in Our National Parks,* Hastings W.–N.W.J.Envtl.L. & Pol'y 47 (1998). Rather, the Organic Act acknowledges the conflict and, saying nothing about how to achieve resolution, grants deference to NPS in balancing the competing and conflicting values.

■ Plaintiffs cite 16 U.S.C. § 20 which states "development shall be limited to those that are necessary and appropriate for public use and enjoyment of the National Park area in which they are located and that are consistent to the highest practical degree with the preservation and conservation of the areas." Defendants correctly point out that the language cited in Section 20 comes from Subchapter IV which is titled "Concessions for Accommodations, Facilities, and Services in Areas Administered by National Park Service" and is part of the National Park System Concessions Policy Act, not the National Parks Organic Act. The purpose of the Concessions Act is to assure that concessionaire development "be limited to those that are necessary and appropriate for public use and enjoyment of the national park area in which they are located. . . ." 16 U.S.C. § 20. Thus, the Concessions Act language Plaintiffs cite is directed primarily at regulating the development of in-park amenities, accommodations and services provided by concessionaires rather than at park infrastructure elements such as roads and drainage. Since the repair of a road does not represent the types of activities of concessionaires contemplated by Section 20, reliance on this section is misplaced in seeking injunctive relief for the activities involved in the Project.

■ The Organic Act is set forth in Section 1, Section 1 notes 2–4, and Sections 22, and 43 of Subchapter I of Title 16 of the United States Code. Taken together, the provisions of the Organic Act establish the National Park Service and provide that the national parks be administered so as to "*conserve* the scenery and the natural and historic objects and the wild life therein *and* to *provide for the enjoyment* of the same in such a manner and by such means as will leave them unimpaired to the enjoyment of future generations." 16 U.S.C. § 1 (emphasis added). Section I recognizes, both implicitly and explicitly the tension between conservation and providing for public enjoyment. Courts have consistently recognized the discretion that the Organic Act accords NPS. *See Bicycle Trails Council of Marin v. Babbitt* 82 F.3d 1445, 1454 (9th Cir., 1996) (noting several courts have accorded NPS authority to determine what uses of park resources are proper and which avenues best achieve the Organic Act's mandates.). The Organic Act itself does not mandate that the balance in any particular decision reflect one value over the other. For that reason, the Organic Act does not serve as basis for a cause of action when the issue is confined to the Agency's exercise of discretion in attempting to balance valid, competing values. The Organic Act would serve as a basis for a cause of action were the NPS to allow use of a national park in a way that was not in the interests of either conservation or public enjoyment or in a way that was clearly against the interests of future generations. The current action does not fall in either category. The current action concerns how best to preserve access to the park while at the same time preserving the values for which the Yosemite Valley and the Merced River corridor were declared a national park. How NPS does that is within its discretion and the Organic Act offers no basis for the court to conclude that Defendants have violated the Act on the basis of NPS's exercise of dis-

cretion to decide that El Portal Road should be repaired in a certain manner.

Plaintiffs, in their Reply Brief, recognize the discretion granted by the Organic Act but assert that NPS "violate[s] that discretion if they have failed to comply with NEPA." Plaintiffs' Reply at 46. This statement, although true, is merely another way of asserting that NPS has not violated NEPA. The assertion of a violation under the National Parks Organic Act adds no independent basis for the issuance of relief to Plaintiffs.

Therefore, the court concludes Plaintiffs are not entitled to injunctive relief under the National Parks Organic Act and their motion for summary adjudication on this issue will be denied.

## IV. THE WILD AND SCENIC RIVERS ACT

### A. Background

All parties agree that the section of the Merced River that lies within the Project area was added to the Wild and Scenic Rivers System by act of Congress on November 2, 1987. Pub.L. No. 100–149, 101 Stat. 879 (1987) (codified at 16 U.S.C. § 1274(a)(62)(A)). Section 1281(c) of the Wild and Scenic Rivers Act ("WSRA") or ("the Act") grants authority and responsibility for the administration of rivers under the provisions of the WSRA that lie within any national park to the National Park Service (NPS) through the Secretary of the Interior. 16 U.S.C. § 1281(c). "The WRSA imposes both procedural and substantive requirements on the agencies responsible for administering a designated area." *Sierra Club v. United States* 23 F.Supp.2d 1132, 1136 (N.D.Cal.1998). Plaintiffs allege that Defendants have violated both procedural and substantive requirements of the WSRA and that a permanent injunction should issue to prevent further violations of the Act.

### B. Procedural Requirements of the Wild and Scenic Rivers Act

WSRA imposes two procedural requirements on administrating agencies. The first of these is the description and notice requirement of sections 1274(b) and (c):

The agency charged with the administration of each component of the national wild and scenic rivers system designated by subsection (a) of this section shall, within one year from the date of designation of such component under subsection (a) (except where a different date if provided in subsection (a)), establish boundaries therefor (which boundaries shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river); and determine which of the classes outlined in section 2, subsection (b), of this act best fit the river or its various segments.

Notice of the availability of the boundaries and classification, and of subsequent boundary amendments shall be published in the Federal Register and shall not become effective until ninety days after they have been forwarded to the President of the Senate and the Speaker of the House of Representatives.

16 U.S.C. § 1274(b).

Maps of all boundaries and descriptions of the classifications of designated river segments, and subsequent amendments to such boundaries, shall be available for public inspection in the offices of the administering agency in the District of Columbia and in locations convenient to the designated river.

16 U.S.C. § 1274(c). The provisions of section 1274(b) were modified by the provisions of section 1274(a)(62)(A) which states in pertinent part:

With respect to the portions of the river designated by this subparagraph which are within

the boundaries of Yosemite National Park and the El Portal Administrative Unit, the requirements of subsection (b) of this section shall be fulfilled by the secretary of the Interior through appropriate revisions to the general management plan for the park, and the boundaries, classification, and development plans for such portions need not be published in the Federal Register. Such revisions to the general management plan for the park shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments.

16 U.S.C. § 1274(a)(62)(A).

Plaintiffs allege that Defendants violated the definition requirement of section 1274(b) by failing to finally adopt the description of the boundaries and the classifications of river segments in the park's General Management Plan ("GMP"). Both parties agree that NPS included the required elements of section 1274(b) in the Draft EIS for the Yosemite Housing Plan which was released in 1996 as a supplement to the Park's GMP. The Draft EIS contains descriptions of the river segments, their classifications (wild, scenic or recreational), and the Outstandingly Remarkable Values ("ORV's") for each segment. 6 AR 1560–65.

The basis for Plaintiffs' contention that NPS violated the requirements of section 1274(b) is that the Draft EIS for the Yosemite Housing Plan has not yet been finally adopted. They contend that it is the adoption of the amendment that assures that development along the river corridor will be consistent with protected status of the river under WSRA. This contention misperceives the function of section 1274(b) and confuses the function of this section with that of section 1274(d). Sections 1274(b) and (c), taken together, constitute a requirement that Congress and the public be notified of the river's protect-

ed status under WSRA. The notification function of section 1274(b) is demonstrated by the fact the time frame for compliance is one year as opposed to the three year time frame for compliance with the more substantively oriented provisions of section 1274(d). Section 1274(c) also directly contemplates the possibility that designations under section 1274(b) may not be final by providing that the public and Congress be notified of any changes or amendments to descriptions of boundaries or classifications.

Defendants correctly point out that the District Court for the Northern District of California, interpreting the requirements of sections 1274(b) and (c), concluded that NPS satisfied the requirements of notice and definition under these sections when they made the boundaries and the descriptions of the river segments available for public inspection. *Sierra Club v. United States,* 23 F.Supp.2d at 1138. Defendants point out that by incorporating the requirements of section 1274(b) into the proposed Draft EIS for the Yosemite Housing Plan, the public not only received notice, but opportunity for comment was given. Formal adoption of the proposed amendments to the Park's General Plan would not accomplish anything in terms of the notice requirement that has not already been accomplished.

■ The court therefore concludes that Defendants are in compliance with 16 U.S.C. §§ 1274(b) and (c) because the required elements have been incorporated into the Draft EIS for the Yosemite Housing Plan.

The second procedural requirement of WSRA is the planning requirement of Section 1274(d). Plaintiffs allege Defendants have violated 16 U.S.C. § 1274(d) by failing to develop a comprehensive management plan for the portions of the Merced River that are within the Project area. Section 1274(d) provides:

For rivers designated on or after January 1, 1986, all the Federal agency charged with administration of each component of the National Wild and Scenic Rivers System shall prepare a comprehensive management plan for each river segment to provide for the protection of the river values. The plan shall address resource practices necessary or desirable to achieve the purposes of this chapter. The plan shall be coordinated with and may be incorporated into resource management planning for affected adjacent Federal lands. The plan shall be prepared after consultation with State and local governments and the interested public within 3 full fiscal years after the date of designation. Notice of the completion and availability of such plans shall be published in the Federal Register.

16 U.S.C. § 1274(d).

Plaintiffs correctly point out that Defendants are not in compliance with the provisions of section 1274(d) because they have not yet prepared a comprehensive management plan ("CMP"). Neither side disputes that NPS is responsible under section 1274(d) to prepare a comprehensive plan. Defendants discuss at some length their plans for the preparation of the plan and where and how the plan will be incorporated. This discussion is irrelevant since the CMP should have been prepared nearly nine years ago if the NPS was to be in compliance with this provision. The issue that is raised by the non-compliance of Defendants is what form of relief is appropriate for non-compliance with the procedural requirements of section 1274(d).

Plaintiffs correctly point out that when an administrative agency has persistently failed to carry out a function required by law the court may "compel agency action [when such action is] unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). By citing this provision of the Administrative Procedures Act and supporting cases, Plaintiffs acknowledge their awareness that a writ of mandamus or mandatory injunction is the major vehicle by which the court may compel agency compliance with the planning provision of WSRA. In addition to requesting a court order to compel NPS to complete and adopt a valid CMP, Plaintiffs have requested the court issue injunctive orders to halt all further work until a CMP is completed. Plaintiffs' argument to support this request is summarized in their assertion that "[w]ithout a comprehensive river management plan, such a conclusion [that the Project will enhance and protect the Merced River] cannot be supported." Plaintiffs' Memorandum at 54:9.

Defendants counter by citing Judge Breyer's decision in *Sierra Club* where the District Court for the Northern Division ruled that the exclusive remedy available where "the NPS has failed to discharge its procedural obligations under the WSRA" is "to bring suit under Section 706(1) of the administrative procedures act to adopt a CMP. Beyond this, however, there is no remedy available to plaintiffs for this procedural violation." *Sierra Club v. United States*, 23 F.Supp.2d 1132 at 1138. The court in *Sierra Club* relied on a series of cases that limit the application of injunctive relief to those situations where there is no less severe remedy available or where congress has specifically authorized injunction as a remedy. *See Brock v. Pierce County*, 476 U.S. 253, 260, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (holding that when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act."); *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir.1995) (holding "failure of an agency to act within a statutory time frame does not bar subsequent agency action absent a specific indi-

cation that Congress intended the time frame to serve as a bar."); *Newton County Wildlife Association v. United States Forest Service*, 113 F.3d 110, 112 (8th Cir. 1997) (holding the Forest Service was not required to suspend timber sales due to the failure to complete WRSA plans on time).

■ The weight of authority favors Defendants' assertion that the failure of NPS to formulate a comprehensive management plan does not, *by itself* warrant the issuance of an injunction to prevent agency action. This does not mean that the absence of a plan or the persistent failure of the NPS to develop a plan as required by WSRA may not be highly material in the analysis of the agency's compliance with the substantive requirements of WSRA. A close reading of the cases cited in *Sierra Club* indicates the existence of an open question as to whether the lack of a CMP may be a significant factor in the analysis of whether an agency has acted arbitrarily or capriciously.

*Brock* and *Idaho Farm Bureau* are distinguishable from the present case by the fact that both cases involved the failure of the agency to perform some discretionary function within a specified time frame. In neither case did the agency fail to carry out a *planning* function. In *Brock*, the agency failed to determine the validity of a complaint alleging the misuse of funds within the statutory period of 120 days. In *Idaho Farm Bureau*, the agency failed to issue a final ruling for a particular species under the Endangered Species Act within the statutory one year time period. In both *Brock* and *Idaho Farm Bureau*, the failure of the agency to carry out the required procedure within the required time period carried no implications for the ability of the agency to exercise its discretion appropriately in other regards. In the present case, however, the development of a CMP is central to the ability of

NPS to properly exercise management over the Merced River Corridor, particularly in the context of a large and complex project that occupies a significant portion of the protected area of the river.

Defendants correctly point out that Section 1281 of WSRA grants agencies discretion in determining what degree of physical disruption of the river's ORV's is permissible by providing that "[m]anagement plans for [each component of the national wild and scenic rivers system] may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." 16 U.S.C. § 1281. As discussed more completely below, Defendants assertion of agency discretion fails to recognize the source of that discretion to "establish varying degrees of intensity" is predicated on the existence of written plan. It is the plan that delineates the degree of protection that must be accorded the river's ORV's and, conversely, which delineates the degree of degradation of the river's ORV's that may be tolerated in the project's execution. Thus, the failure of NPS to develop a plan may evince a lack of ability to adequately consider those values for which the stream segment was designated under the Wild and Scenic Rivers Act. If Plaintiffs successfully demonstrate degradation of any of the river's ORV's, Defendants' reliance on *Brock* and *Idaho Farm Bureau* will not be sufficient to deflect the allegation that Defendants failed to consider all relevant factors in the planning and execution of the project.

In *Newton County*, 113 F.3d at 110, the situation is more analogous to the current situation. *Newton County* is an Eighth Circuit case where Plaintiffs sued USFS to enjoin the sale of timber in a national forest where there were potential impacts to a river in the Wild and Scenic Rivers System. The court ruled that USFS could act even though they did not have a CMP in place. However, *Newton County* is fac-

tually distinguishable from the present case in that the three year statutory time limit for the development of a CMP had not run at the time the contract for sale of timber was let. Although the court in *Newton County* incorporated language that suggested they would have ruled similarly if the three year period had expired, the *Newton* court was still not looking at a case where the period of violation was in excess of eight years. *Newton County* is not binding in this district and it is a case that has received some criticism. *See* Douglas McHoney, *The Wild and Scenic River Act's Comprehensive Management Plans: Are They Really Mandatory?* 5 Mo.Envtl.L. & Pol'y Rev. 155 (1998).

The reluctance of courts to apply injunctive relief in cases where the sole infraction is the failure of the agency to conform to planning requirements appears to reflect courts' judgment that the loss of agency ability to act is too severe a penalty to apply when the only violation is procedural. *See Brock v. Pierce County,* 476 U.S. at 260, 106 S.Ct. 1834. However, where, as here, an agency has egregiously violated a procedural planning requirement which is closely linked to the ability of the agency to adequately assess the impacts of future plans and actions on the river's ORV's, that procedural violation lends great weight to assertions that the substantive requirement to preserve and enhance the values for which river was included in the wild and scenic river system has been violated. While applicable case law does prevent the issuance of injunctive relief based solely on the violation of the requirement that NPS formulate a comprehensive management plan, this court can find no authority that prohibits the consideration of this procedural violation in the determination of whether agency plans or actions violated the substantive provisions of the WSRA.

Based on the above considerations, the court finds the failure of NPS to develop a CMP constitutes a violation of 16 U.S.C. § 1274(d) and will grant the Plaintiffs' request for declaratory judgment. The court declines to grant injunctive relief to halt project work solely on the basis of this violation but reserves consideration of this violation as a factor in the assessment of whether Defendants have violated substantive provisions of the WSRA.

## C. Substantive Requirements of the Wild and Scenic Rivers Act

The court must next determine whether NPS has violated the substantive requirements of the WRSA independent of the procedural requirements addressed above. As discussed above, in examining the allegations of the parties, the court applies the judicial standard of abuse of discretion to determine if the administrative record indicates substantive violation of the Act.

The Wild and Scenic Rivers Act provides in pertinent part:

> Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281. These management provisions are triggered when a river segment is designated a part of the national wild and scenic rivers system either by act of Congress, 16 U.S.C. § 1273(a)(i), or pursuant to an act of the state legislature of the state through which the river flows. 16 U.S.C. § 1273(a)(ii). Rivers are desig-

nated in the national wild and scenic rivers system because they possess one or more "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historical, cultural, or other similar values...." 16 U.S.C. § 1271. Rivers that possess one or more of these outstandingly remarkable values ("ORV's") may, along with related adjacent land, be included in the wild and scenic river system and, so included shall be classified according to the provisions of Section 1273(b) of the WSRA which provides in pertinent part:

Every wild, scenic or recreational river in its free flowing condition or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines ant that may have undergone some impoundment or diversion in the past.

16 U.S.C. § 1273(b).

Both parties agree, and the Administrative Record reflects, that all of the Merced River within the Project area has been included within the wild and scenic rivers system and that it has been classified according to the provisions of Section 1273(b). 2AR 00600–02. Most of the river that lies within the project area has been classified as Scenic. A small segment of the river that consists of the pool above the old hydropower impoundment is currently designated Recreational. Id. ORV's have been identified for each segment of the river within the Project area. 2AR 00603.

Plaintiffs' main general allegation is that Defendants "utterly failed to evaluate how the road project protects and enhances [the ORV's], how the project protects against degradation of the Merced River corridor or how it furthers the purposes of WSRA." Plaintiffs' Memorandum at 47. Plaintiffs more specifically allege Defendants failed to discuss or consider the effects of "blasting into canyon walls, rip-rapping large sections of the river bank, further constricting the river channel or removing vegetation" on the values that are protected by WRSA. Plaintiffs' Memorandum at 47–48. In support of these allegations, Plaintiffs offer a number of declarations that purport to demonstrate inadequate planning and consideration by NPS. These declarations include the Sanders Declaration (assessing the adequacy of NPS environmental surveys and mitigation plans), the Cehrs Declaration (assessing the adequacy of NPS hydrological data and projections), the Kattlemann Declaration (examining the potential disruptions to stream-side ecology and the effectiveness of mitigation measures) and the Randall Declaration (examining the sufficiency of NPS revegetation plans and the possible effects of the Project on local plant ecology). All of these declarations allege the NPS did not adequately study the environmental impacts of the Project to justify the issuance of a FONSI. One declaration does assert that the contractor has failed to adequately carry out mitigation measures to preserve vegetation within the

Project area. *See* Sanders Dec. at ¶¶ 19–20.

Defendants point primarily to the Revised EA dated August 22, 1997, to demonstrate planning for and consideration of environmental impacts within the Project area. The report specifically addresses, *inter alia*, project effects on geology and soils, hydrology and water resources, climate, air quality, noise, vegetation, wildlife and cultural resources. *See generally* 2AR 00522 – 00648. The Revised EA lists the species potentially or actually present in the Project area and generally assesses impacts to groups of plants or. animals within the project area. 2AR00602–18. Defendants specifically reference the consideration by NPS of environmental impacts predicted for "no action," 11 foot travel lanes and 12 foot travel lanes for each of the ORV's in the revised EA. 2 AR 000623–4 (visual and scenic values), 2 AR 006–10–11 (geologic values), 2 AR 00613–14 (air quality), 2 AR 00615–19 (biological values) and 6 AR 01659–95 (cultural and historical values). Defendants also assert the removal of the Cascade Dam represents an enhancement of river values because it will make the affected segment of the stream eligible for upgrade from "recreational" to "scenic" status. 2 AR 00623, 4 AR01109.

Plaintiffs allege that NPS knew that various Project activities would or could cause alterations of stream flow velocity and sedimentation patterns. It is further contended that the NPS did not have enough information to perform a sediment transport and hydraulic analysis which would show whether stream flows would be altered so as to be hazardous. Defendants counter that these factors were fully considered in the Revised EA or were part of consideration of prior repairs which are not part of the current project or are concerns that have been raised as to small portions of the project (Cascade Dam removal) which have been inappropriately extrapolated to the entire project.

Additionally, Plaintiffs make specific allegations regarding Defendants' violation of substantive provisions of WSRA. Plaintiffs allege that Defendants failed to mention the encroachment of 0.34 acres of riprap and fill below the ordinary high water mark of the river in the Draft or Revised EA but that they were aware the planned Project did call for fill and rip-rap activity. Defendants do not directly address this incursion of fill into the river. Defendants respond by referring to the assessment of Project impacts on hydrology and water resources in the Revised EA. The Revised EA does address the possible or likely encroachment of fill into the river, but concludes that such encroachment will be limited. 2 A. R00611. The Revised EA concludes that the overall impact on hydrology and water quality will be positive due to the limitation of further erosion of stream banks during flood events by the use of better drainage and containment systems. 2 AR 00611–13, 2 AR 00642.

In a similar vein, Plaintiffs allege the Draft or Revised EA contains no mention of the logging of live oaks in order to extend the road into the "extremely unusual canyon live woodland research area," a designated ORV for the Merced River Gorge area of the Project. *See* 2AR 0063 (describing the canyon live oak research area). Defendants respond, again in general terms, by referring to the assessment in the EA of impacts of mitigated Project activities on biological resources.

Evaluation of the allegations of Plaintiffs and answers by Defendants are hampered by the fact that the Administrative Record, although it appears to address all of the issues raised by Plaintiffs and Defendants, does so in a conclusory manner. Where NPS studies are cited to support the rational basis of agency action, there is little indication of how studies were actually conducted or whether they were, in fact, adequate by some objective standard. The crux of Plaintiffs' arguments devolve

into assertions by Plaintiffs, bolstered by various declarations, that Defendants did not adequately consider Project impacts as required by WSRA. Defendants, bolstered by declarations from their own experts, counter they did adequately consider impacts. The administrative record is not sufficient to settle the issue definitively one way or the other.

Notwithstanding the allegations and rebuttals of Plaintiffs and Defendants, a few facts are uncontested and these facts are sufficient to resolve the issue of whether there has been a violation of the substantive provisions of the WSRA. First, it is established that approximately 0.34 acres of fill and rip rap has been placed in the Merced River below the mean high water mark. Second, it is not contested that there has been some fill activity down slope which has disrupted and in some cases fragmented the riparian habitat along the north side of the river. Third, although there remains some controversy as to exactly how high the new formliner guard walls will be and how they will appear, there is no doubt they will be at least one inch higher than the stone wall that is being replaced. *See* Plaintiffs' Reply Memorandum to Defendants' Supplemental Brief at 15–18 (alleging Defendants have not provided evidence to support their contention the new walls will be only one inch higher than the old walls and alleging the new replacement walls will have a "fake" appearance.) An additional fact that is in dispute but that the court notes is important to the final disposition of this case is that Plaintiffs allege Defendants have prepared two plans for the removal of the Cascade Dam in Segment D. Plaintiffs allege Defendants have referenced these plans interchangeably even though they are different in their effect on the Project area. One plan, allegedly developed in 1987, calls for the removal of the dam and appurtenant structures completely without reference to any changes in the nearby road. The second plan, allegedly developed in 1997, links the removal of the dam with the acquisition of materials and space to widen and realign the road in Segment D.

Defendants contend there are three overarching considerations that they allege tend to direct judgment in their favor: "1) agencies have substantial discretion to manage protected rivers, 2) agencies can manage a river with 'varying degrees of intensity for its protection and development at allow for uses that do not substantially interfere with public enjoyment of [the river's] values,' 16 U.S.C. § 1281(a); and 3) the El Portal Road was in existence at the time the Merced [River] was added to the Wild and Scenic River's System." Defendants' Memorandum at 51–52.

The first and second factors asserted by Defendants fail to lend sufficient support to Defendants' claim for judgment in their favor for the same reason; they both depend on the existence of a comprehensive management plan that provides a basis for agency decision making. The Administrative Procedures Act provides that the reviewing court shall set aside agency action if the action is found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and Capricious" has been interpreted for the Ninth Circuit in *Dioxin/Organochlorine Center v. Clark.*

> We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Dioxin/Organochlorine Center v. Clarke,* 57 F.3d 1517, 1521 (9th Cir.1995). In the

present case, NPS entirely failed to consider predetermined levels of protection that were to be accorded the ORV's that were described when the Merced River was included into the National Wild and Scenic Rivers system. These predetermined levels of protection were required by Congress when it amended the Wild and Scenic Rivers Act in 1986 to include the requirements for a comprehensive management plan in the provisions of Section 1274(d). Defendants may assert that the intrusions of the project into the river or the disruptions in riparian habitat or the alterations in the views from the perspective of drivers on the road are *de minimus* or are justified by the overall good accomplished or that, on the balance, the project enhances the river's ORV's. However, absent some objective, pre-determined criteria for describing and assessing such impacts, the assertion is merely a post hoc justification for project outcomes.

Similarly, the claim by Defendants that they should be granted judgment because "agencies can manage a river with 'varying degrees of intensity for its protection and development' . . ." fails because the ability of agencies to manage with "varying degrees of intensity" is tied to "management plans" which are not in existence. Defendants' Brief at 51:27 (quoting 16 U.S.C. § 1281). The complete sentence in Section 1281 which Defendants incompletely cite reads "*[m]anagement plans* for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." 16 U.S.C. § 1281 (emphasis added). Thus, Congress did not intend that agencies could manage with varying degrees of intensity according to the exigencies of the moment, rather Congress allows agencies to pre-determine how and to what extent the exceptional values of a particular segment of wild and scenic river will be protected and to set forth that determination in a plan (the CMP) which

will serve as guidance for future agency actions. Absent a qualifying "Management Plan," Defendants' determination that their actions were within the bounds of the "varying degrees of protection" allowed by statute is, again, a mere post-hoc justification of project outcomes.

Finally, Defendants' argue Plaintiffs' WSRA claims must fail because the El Portal Road was in existence at the time the Merced River was added to the Wild and Scenic Rivers System. While Defendants are correct in asserting that the classification of the segment of the river as Scenic incorporates the existence of the Road, they offer no support for the contention that the existence of a road at the time of designation confers discretion to NPS to conclude that a particular quantum of degradation of the river's ORV's are an acceptable result of the Project. The basic issue in dispute in this case is not the existence of the Road, it is the degree to which the Road, as reconstructed, departs from the character of the original road and the degree to which the reconstruction of the Road has, or will, result in the degradation of the Merced River's ORV's. Defendants' assertion that they are due judgment again fails. The absence of a predetermined plan that sets forth allowable degrees of intrusion upon the river's ORV's renders Defendants' claim of no significant impact on the river's ORV's arbitrary because the basis for that determination is lacking.

In another factual context, Defendants might legitimately conclude that the occasional fragmentation of the riparian habitat, the slightly extended height of the guard walls, and the increase of the footprint of the road by twenty percent with a small extension of the footprint into the river was acceptable because it was within the parameters of the plan. In such a context, Defendants' would have timely completed a comprehensive management plan and the plan would have delineated

the degree of intensity with which the values of the river corridor would be protected and enhanced. As it is, the persistent and protracted failure of NPS to complete the required plan removes the basis for the Defendants' conclusion that these effects of the project are minor and allowable within the amount of protection that is required under WSRA. The absence of a basis for the conclusion of no significant harm to the river's ORV's renders the planning and execution of the project arbitrary or capricious and therefore violative of both the Administrative Procedures Act and the Wild and Scenic Rivers Act.

 Based on the foregoing, the court concludes that Defendants' persistent and protracted failure to develop a comprehensive management plan in compliance with 16 U.S.C. § 1274(d) is an important factor in the determination of whether Defendants acted arbitrarily and capriciously in the planning and execution of the El Portal Road Project. The court finds that when Defendants' planned and later expanded the footprint of the road into sensitive riparian areas and into the bed of the river and when the Defendants planned and later removed the historic guard walls to be replaced with a higher guard wall, Defendants did so without consideration of all relevant factors in violation of 5 U.S.C. 704(2)(A). Specifically, Defendants planned and executed those activities without reference to the required comprehensive management plan or any other pre-existing plan that would have adequately informed the decision whether the construction activities to be undertaken were an allowable degradation of the values for which the Merced River was included in the National Wild and Scenic River System. The court finds that Defendants' actions with respect to the planning and execution of the Project are arbitrary and capricious and therefore violate the substantive provisions of 16 U.S.C. § 1281.

## V. RELIEF

The court has found that Defendants are in violation of Section 1274(d) of the WSRA which requires that Defendants prepare a Comprehensive Management Plan for those segments of Merced River designated as being part of the National Wild and Scenic Rivers System. Courts within the Ninth Circuit have previously explored the issue of whether a mandatory injunction may issue to require an agency to develop a Comprehensive Management Plan. *National Wildlife Federation v. Cosgriffe*, 21 F.Supp.2d 1211 (D.Or. 1998), is a case directly on point. In *National Wildlife Federation*, defendant Bureau of Land Management was sued to compel the Bureau to complete a CMP where the bureau had failed to finalize a plan five years after the date the river was included into the Wild and Scenic Rivers System. *Id.* at 1215. The court extensively analyzed the issue of whether a mandatory injunction could issue under both APA standards and Writ of Mandamus standards. *Id.* at 1218–19. The court concluded that "under either the TRAC (APA) or the mandamus standards, plaintiffs are entitled to their requested injunction." *Id.* at 1220. In *National Wildlife Federation*, as in the present case, Defendants asserted that Plaintiffs already have an adequate remedy because Defendants are in the process of preparing a CMP. The *National Wildlife Federation* court rejected this argument noting that the voluntary undertaking of the formulation of a plan is not legally binding and that the " 'trust us' approach is not warranted given [Defendants'] belated actions since the designation of the [river]." *Id.* at 1219–20.

 The court therefore will grant Plaintiffs summary adjudication on their request for mandatory injunctive relief regarding formulation and adoption of a valid Comprehensive Management Plan as required under 16 U.S.C. § 1274(d). The CMP is to be completed and adopted by NPS not later than twelve months from the filing of this decision. In their Memorandum in Support of Injunctive Relief,

Plaintiffs also request that all work along the Merced River corridor be enjoined pending the completion of the CMP. The court does not incorporate this requested relief into the mandatory injunction discussed above. All requests for enjoining work in Segments A, B and C, including requests contained in Sections III A, C and D in Plaintiffs' Memorandum in Support of Injunctive Relief, will be discussed together below.

Plaintiffs request the court require that Defendants amend the General Management Plan in accordance with WSRA to include river classifications, boundaries, and Outstandingly Remarkable Values in accordance with 16 U.S.C. § 1274(b). As discussed above, the court finds that the provisions of Section 1274(b) are in the nature of notice requirements and that the incorporation of the required elements into the Housing Plan addendum to the GMP is sufficient for the purposes of compliance with this section whether the Housing Plan has been finally adopted or not. In this regard, the court concurs with the judgment of the district court in *Sierra Club v. United States*, 23 F.Supp.2d at 1138.

The court therefore will deny Plaintiffs' request to require amendment of the General Management Plan.

 Plaintiffs request that the court direct Defendants to develop an oversight committee to ensure the protection of the environment. Plaintiffs offer no authority for such a court ordered imposition into agency managerial affairs nor does the court's examination of the Administrative Practices Act reveal any such authorization. Considerable technical expertise is involved in the planning and execution of the El Portal Road project. Neither Plaintiffs' belief that Defendants have wrongly decided a number of issues nor the court's determination Defendants have violated specific statutory provisions is sufficient cause for the court to impose a managerial structure where no such imposition is authorized by law. Courts must defer to the informed discretion of the responsible federal agencies. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

The court therefore will deny Plaintiffs' request for injunctive relief in the form an oversight committee to ensure the protection of the environment.

Plaintiffs request that the court order Defendants to complete the Revegetation Plan. In response, Defendants claim that the revegetation plan for the Project is being developed and will be implemented by Bitterroot Restoration under contract with NPS. Defendants further argue that the revegetation plan can only be implemented after completion of the Project, because the revegetation programs cannot proceed on unstable slopes or with uncontrolled drainage.

Plaintiffs also request that the court order that the revegetation plan be reviewed by an impartial body of restoration ecologists and revegetation specialists, and be made available to the public. Relatedly, Plaintiffs request an order requiring an audit of vegetation removal and preservation as currently existing, so as to evaluate the current status of the environment. Finally, Plaintiffs request a complete evaluation of the impacts to Tompkins Sedge.

In response, Defendants provide a declaration by the Natural Resources Project Manager for the Flood Recovery Office at Yosemite National Park, stating that the scientific panels and audit reports are "unnecessary and will not increase the effectiveness of the revegetation efforts on the Project." Defendants rely on the Declaration of Susan Fritzke, stating that the revegetation plan for the Project is being developed and will be implemented by Bitterroot Restoration under contract with NPS.

■ Defendants assert that to date, ten orders for revegetation work have been issued, and that every one has been completed on time and in accordance with contractual requirements. Plaintiffs do not dispute this, or cite any defects in this work. Further, Defendants assert that the revegetation cannot be accomplished until after completion of the heavy earth-work, but that the revegetation plan for the Project is now being developed and will be implemented. The court finds that Defendants' failure to develop a revegetation plan before this time is clearly attributable to the "design/build" method of construction, and has resulted in an impairment of Plaintiffs' ability to assess the impacts of the Project. However, the court finds that Plaintiffs have not demonstrated irreparable injury in connection with the tardy completion of the revegetation plan sufficient to support injunctive relief. *See Weinberger,* 456 U.S. at 313, 102 S.Ct. 1798 (holding that a federal judge considering a request for equitable relief is not obligated to grant an injunction for every violation of law).

Accordingly, the court will deny Plaintiffs' requests for injunctive relief in connection with the revegetation plan.

■ Plaintiffs request that the court order that an impartial bat expert evaluate the current status of the bat roosts along El Portal Road, and make recommendations for mitigating or compensating the alleged impacts on the bats. Plaintiffs argue that the results of this report should be made available to the public and subject to review by an independent panel of wildlife biologists. While the court has concluded that Plaintiffs have raised substantial questions as to whether the Project will have a substantial effect on the environment in the form of the local bat population, the court cannot conclude that Plaintiffs have demonstrated irreparable injury in regard to bat species so as to justify injunctive relief.

Accordingly, the court will deny Plaintiffs' requests for injunctive relief in connection with the bat species. .

Finally, Plaintiffs request that the court order Defendants to prepare an EIS on the Project in compliance with NEPA. As explained below, the court declines to enjoin further work on Segments A, B and C. Without such an injunction, an order requiring an EIS on those segments of the Road would be inappropriate. The court therefore will not order Defendants to prepare an EIS as to Segments A, B and C of the Road.

■ As to Segment D, in light of Defendants' statements in their Supplemental Brief and the injunction explained below, it is unclear exactly what form Defendants' eventual work on Segment D will take. Therefore, the court cannot reasonably order Defendants to prepare an EIS on this segment of the Road. However, as set forth below, the court will enjoin Defendants from all further work on Segment D, except sewer repairs and slope stabilization if necessary to prevent erosion, pending conformance with all NEPA requirements. The area where all work is be enjoined includes the area commencing at and including Cascade Dam, where the El Portal Road/Highway 120 intersection is located, and going east to the Pohono Bridge, where one-way traffic commences. *See* Defendants' Supplemental Brief, 1: 23–26. Thus, if the final form of work on Segment D is such that would significantly affect the quality of the human environment, Defendants must prepare an EIS.

*Plaintiffs' Request to Enjoin Further Work and the Balancing Test*

The court has found that Defendants have violated both the substantive provisions of the Wild and Scenic Rivers Act and NEPA. Injunctive relief may issue as a result of these violations. *See, e.g. Oregon Natural Desert Association v. Green,*

953 F.Supp. 1133, 1149 (D.Or. 1997) (granting injunctive relief on the basis of both NEPA and WSRA violations). Plaintiffs, in their Memorandum in Support of Injunctive Relief, assert the court need not apply a balancing test in order to grant injunctive relief where there has been a WSRA violation. Plaintiffs cite *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) and a number of other cases for the proposition that agency action which threatens an endangered species creates the presumption, as a matter of law, that an injunction should issue. That is, the plaintiff is not required to show the balance of benefits in favor of the species, the balance is rebuttably presumed. Assuming, arguendo, that this proposition is supported by the cited cases for the ESA, Plaintiffs' argument to extend the proposition to WSRA fails because the analogy itself is inapt on at least three levels.

First, the point of analogy is inaccurate. Plaintiff's argument is premised on the notion that the designation of a river as Wild and Scenic is analogous to the listing of a species as threatened or endangered. The court's reading of the two statutes leads to a different conclusion. The designation of a river as Wild or Scenic is a permissive act of congress, or of a state, that confers jurisdiction under WSRA to that particular stretch of river. On the other hand, the listing of a species as endangered is an act of agency discretion that represents a conclusion that the species is endangered based on due consideration of best scientific evidence in accordance with 16 U.S.C. 1533(b). It is this determination that a species is endangered or threatened that triggers the substantive protections of ESA including the presumption of the invalidity of agency action when that action may harm an endangered species. The statutory language of the ESA which is then activated provides the presumption that the identified species is to be protected. In the case of the WSRA,

there is no statutory presumption that once a river is listed, each and every insult to the ORV's of the river constitute an enjoinable violation of the Act. As discussed earlier, a valid CMP may provide varying degrees of intensity of protection. No such leeway is to be found in the ESA.

Second, the attempt by Plaintiffs to argue by analogy that an injunction may issue for a substantive violation of WSRA without the need for a balancing test is weakened by the fact that balancing tests are, in fact, imbedded in the language of the ESA. While there may be a presumption that in injunctive should issue where agency action may harm an endangered species, the agency may apply for and be granted an exemption where "the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest." 16 U.S.C. § 1536(h)(1)(A)(ii). Thus, the agency may still invoke a weighing test to require a balancing of threats to endangered species with issues of public interest such as safety.

Third, the degree of procedural detail in the ESA and the lack of similar language in the WSRA prevents any conclusion that Congress must have intended for the same presumptions of invalidity of agency action to apply where there is a threat to one or more ORV's by a proposed agency action. The ESA describes how the endangered or threatened status of a species is determined, what measures are required for protection of the species, procedures for exemptions, what penalties are imposed for violations and many other issues in fine detail. No such similar detailed guidance is present in WSRA. What ESA takes pains to describe in minute detail over dozens of pages, the WSRA dispenses with in a single paragraph:

Each component of the national wild and scenic rivers system shall be adminis-

tered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281(a). If anything, WSRA seems deliberately ambiguous as to how an agency is supposed to balance the recognized tension between use and preservation. In this regard, the language of WSRA is more analogous to the language of the National Parks Organic Act, 16 U.S.C. § 1, in its failure or reluctance to provide clear guidance to agencies. Lacking the clarity and specificity that is present in the ESA, the WSRA cannot be construed to limit agency jurisdiction and discretion to the same extent as the ESA. Further, WSRA does not provide the same explicit basis for a legal presumption of invalidity of agency actions.

 "Upon finding a violation of NEPA or the WSRA, the court must consider the balance of irreparable harm and the public interest in deciding whether to issue a permanent injunction." *Oregon Natural Desert Association v. Green,* 953 F.Supp. at 1142 (citing *Production Co. v. Village of Gambell,* 480 U.S. 531, 544, 107 S.Ct. at 1403–04 (1987)). The court concludes that the Plaintiffs' attempt to avoid a weighing test under WSRA fails because the analogy to ESA is inapt, because ESA itself does not completely dispose of the requirement for a weighing test and because the language of WSRA provides no basis for the elimination of a weighing test.

The court therefore considers Plaintiffs' requests for injunction of further work along the Merced River corridor together and applies a weighing test to determine if injunctive relief should issue. The legal standard for the issuance of injunctive relief was discussed previously. *See supra* at 1209. As regards the balancing test in particular, "[i]n each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

It is convenient to consider first all of Plaintiffs' request to enjoin all work or enjoin environmentally destructive work in Segments A, B, and C together, followed by a discussion of the request for similar injunctive relief in Segment D.

In Segments A, B, and C, all parties agree that substantial work has been completed and that work must continue in order to make the road both traffic safe and resistant to the erosive effects of winter rains or floods. Parties differ sharply as to precisely what actions are necessary to accomplish these general goals and to mitigate past damage. Defendants have argued vigorously that the only means practically available to make the road traffic safe, to preserve the integrity of the road during the winter and to commence mitigation efforts is continue current plans for Segments A, B, and C to completion. Defendants assert that the road can be stabilized without the completion of surfacing operations according to plan and without any additional cut or fill work. Plaintiffs have submitted a highly detailed description of plants and other natural features they request the court to protect. Defendants have responded that a substantial majority of the listed plants and natural elements will not be disturbed in the completion of the project. Defendants argue vigorously, however, that road surfacing must continue as planned in order to achieve the required degree of auto safety and weather resistance.

The court regretfully agrees that reconstruction of the guard wall with cut granite blocks is not economically feasible in today's economic climate. Safety and engineering considerations have required the old guard wall be replaced and there it is no longer possible to economically provide the massive amount of skilled labor that would be required to reconstruct the wall in its original material and configuration. Also the court finds that Defendants have presented sufficient information to justify a finding that the road must be completed to its final grade as planned.

Finally, the court finds that it would be cumbersome to the point of impracticality to provide injunctive relief to the level of detail and judicial supervision that would be required to accomplish Plaintiffs' requested remedy. While the court appreciates that Plaintiffs have diligently complied with the court's request for detail as to the specific activities they wish the court to enjoin, the court can conceive of no way of crafting relief while still allowing Defendants to manage the remaining required work. The court cannot enmesh itself in the day-to-day operations of Defendants' project to the level of detail that would be required in order to judicially assure the protection of even the agreed upon plants and natural elements. The benefits in terms of environmental protection, were the court to so enmesh itself, would be quite minor compared to the burdens to both Defendants and the court, given the minimal degree of damage that Defendants assert will eventuate from the completion of the project in Segments A, B, and C.

The court therefore finds that in applying the balancing test, it is precluded from providing injunctive relief as to the work remaining to be done in Segments A, B, and C with one exception. Since Defendants have stipulated that the new guard wall will extend no more than one inch higher than the wall that is being replaced, the court finds there is no burden to Defendants in the judicial enforcement of that stipulation.

The court therefore will enjoin Defendants from the erection of any stream-side wall that rises more than 27 inches above surface of the Road.

As to Segment D, Defendants have stipulated that there is no work to be accomplished in that section except for the removal of the Cascade Dam and its appurtenant structures, removal of accumulated sediment, sewer repair and "some embankment stabilization to protect the existing road." Defendants' Supplemental Brief at 1. Defendants' approval for all other work in Segment D has been withdrawn. As noted previously, there remains some controversy as to the removal of the dam and facts before the court are not clear as to what the plans for the removal actually are. Injunction of all work in Segment D would, presumably, be of little burden to Defendants. In environmental terms, maintenance of the status quo represents no degradation in terms of the river's ORV's. There is also little judicial burden in the issuance of an injunction that broadly prohibits all work in a given area. Since Defendants have violated both substantive and procedural provisions of the Wild and Scenic Rivers Act and provisions of NEPA, and because the removal of the Cascade Dam, if carried out in accordance with plans alleged by Plaintiffs, may result in further violations; injunctive relief is appropriate.

The court will enjoin Defendants from all work in Segment D except sewer repairs and slope stabilization, if necessary to prevent erosion, pending the completion of a valid Comprehensive Management Plan and conformance with all NEPA requirements. The removal of the Cascade Dam is included in this injunction.

## ORDER

For the reasons stated in the above Memorandum Opinion, IT IS HEREBY ORDERED as follows:

1) As specified in the findings and conclusions set forth above, Plaintiffs are GRANTED summary judgment in part on their first cause of action set forth in their First Amended Complaint that Defendants violated NEPA;

2) Based on the findings and conclusions set forth above, Plaintiffs are DENIED summary judgment and Defendants are GRANTED summary judgment on Plaintiffs second cause of action set forth in their First Amended Complaint that Defendants violated NEPA by failing to consider alternatives;

3) Based on the findings and conclusions set forth above, Plaintiffs are DENIED summary judgment and Defendants are GRANTED summary judgment on Plaintiffs third cause of action set forth in their First Amended Complaint that Defendants violated the National Park Service Organic Act;

4) As specified in the findings and conclusions set forth above, Plaintiffs are GRANTED summary judgment on their fourth cause of action set forth in their First Amended Complaint that Defendants violated the Wild and Scenic Rivers Act;

5) As specified in the findings and conclusion set forth above, Plaintiffs are GRANTED summary judgment on their fifth cause of action set forth in their First Amended Complaint that Defendants violated the Wild and Scenic Rivers Act;

6) Plaintiffs are GRANTED declaratory judgment on their claim that the EA, FONSI and Biological Assessment issued on the El Portal Road Improvement Project were issued in violation of the National Environmental Policy Act;

7) Plaintiffs are GRANTED declaratory judgment on their claim that Defendants violated the Administrative Procedures Act by failing to adopt a comprehensive management plan for the Merced River, pursuant to the Wild and Scenic Rivers Act;

8) Plaintiffs are DENIED declaratory judgment on their claim that Defendants violated the Administrative Procedures Act by failing to develop revisions to the Yosemite National Park General Management Plan to comply with 16 U.S.C. 1274(b);

9) Plaintiffs are GRANTED declaratory judgment on their claim that Defendants violated the Administrative Procedures Act by violating the substantive provisions of the Wild and Scenic Rivers act by failing to protect and enhance the values of the Merced River as a designated river under the Wild and Scenic Rivers Act;

10) Plaintiffs are DENIED declaratory judgment on their claim in regard to the National Park Service Organic Act;

11) The National Park Service SHALL prepare and adopt a valid Comprehensive Management Plan pursuant to 16 U.S.C. § 1274(d) in regard to the Merced River as designated under the Wild and Scenic Rivers Act no later than twelve months after the entry of this decision;

12) Plaintiffs' request for an order requiring Defendants to amend the General Management Plan is DENIED;

13) Plaintiffs' request for appointment of an oversight committee to protect the environment is DENIED;

14) Plaintiffs' request for an order requiring Defendants to complete the Revegetation Plan is DENIED;

15) Plaintiffs' request for appointment of an impartial bat expert is DENIED;

16) Plaintiffs' request for an order requiring Defendants to prepare an EIS on the El Portal Road Project is DENIED;

17) Plaintiffs' requests to enjoin further work on Segments A, B and C based on both National Environmental Policy Act and Wild and Scenic Rivers Act violations are DENIED with the exception that Defendants are enjoined from the erection of any stream-side wall that rises more than 27 inches above the surface of the Road;

18) Plaintiffs' request to enjoin further work on Segment D is GRANTED as follows: Defendants are enjoined from all work in Segment D, including removal of Cascade Dam, except sewer repairs and slope stabilization, if necessary to prevent erosion, pending the completion of a valid Comprehensive Management Plan and conformance with all NEPA requirements.